[Nos. 1944 and 1967]

ANGUS McLEOD, Respondent, *v.* MILLER & LUX, PACIFIC LIVESTOCK COMPANY, JOHN B. GALLAGHER, and J. C. SNYDER, Administrator of the Estate of Charles Snyder, Deceased, Appellants.

[153 Pac. 566; 167 Pac. 27]

1. Evidence—Opinions—Ultimate Fact—Exclusion.

Where, in an action for the overflow of plaintiff's ranch by defendant's dam, nonexpert witnesses testified in detail to the facts as to previous overflows, and the location of various dams and ditches was minutely described by them, the opinion of such witnesses as to whether defendants' dam caused the overflow should have been excluded, since witnesses cannot testify to matters of ultimate fact, except where it is impossible for them to detail the evidentiary facts so as to enable the jury to draw a conclusion.

2. Evidence—Physical Law—Refutation.

Where the testimony of witnesses is refuted by physical law or matters of common knowledge, no probative force can be allowed such testimony.

3. Evidence—Experts—Ultimate Facts.

Where, because they are unknown, it is impossible to apply fixed natural laws to the solution of an issue, expert testimony may be considered as well as facts established by the testimony of other witnesses as the best means available of determining the truth.

4. Waters and Watercourses — Flowage — Independent Acts — Liability.

Where the dam of other parties in conjunction with that of defendants caused the overflow of plaintiff's ranch, defendants were not liable for the whole damage, since, when two or more parties act each for himself introducing the result complained of, they cannot be held liable for the acts of each other.

5. Waters and Watercourses — Overflow — Future Injury — Prophecy.

In an action for injury to plaintiff's ranch caused by an overflow from defendants' dam, it was error to allow testimony of a mere prophecy made by a third person to the witness several years before the action that the dam if constructed higher would ruin plaintiff's land.

6. Evidence—Opinions—Extent of Damage.

In an action for the overflow of plaintiff's ranch from defendants' dam, it was error to allow a witness to give his opinion as to the extent of the damage done; the proper method being to have the witness testify to the value of the ranch before and after the overflow.

7. DEPOSITIONS—READING BY OTHER PARTY—OBJECTION BY PARTY TAKING.

Where testimony legally objectionable in substance was elicited from the plaintiff on cross-examination by his attorneys in his deposition taken by defendants, and the deposition was read in evidence by plaintiff as provided for by Comp. Laws, 3504, thereby making the deposition plaintiff's own evidence under the provision to that effect of section 3505, an objection made by defendants on the trial to the admission of such objectionable testimony should have been sustained, though the deposition was taken on defendants' motion, since, under a further provision of section 3504, the evidence taken in a deposition is subject to all legal exceptions.

8. DEPOSITIONS—TESTIMONY—OBJECTION AT TRIAL.

The objection to such substantially inadmissible evidence was properly made at the trial instead of at the taking of the deposition, under the provision of Comp. Laws, 3504, that depositions may be used upon the trial subject to all legal exceptions.

ON REHEARING

1. EVIDENCE—OPINION—ULTIMATE FACT.

In an action for the overflow of plaintiff's ranch by defendants' dam, where nonexpert witnesses testified in detail to the facts as to previous overflows, and the location of various dams and ditches was minutely described by them, the opinions of such witnesses as to whether defendants' dam caused the overflow should have been excluded, as witnesses cannot testify to matters of ultimate fact, except where it is impossible for them to detail the evidentiary facts so as to enable the jury to draw a conclusion.

APPEAL from First Judicial District Court, Lyon County; *Frank P. Langan,* Judge.

Action by Angus McLeod against Miller & Lux, Pacific Livestock Company, John B. Gallagher, and J. C. Snyder, administrator of the estate of Charles Snyder, deceased. From a judgment for plaintiff, defendants appeal. **Reversed** (McCARRAN, J., dissenting).

*W. A. Massey, Edward F. Treadwell, Cheney, Downer, Price & Hawkins,* and *Charles B. Henderson,* for Appellants:

The complaint does not state a cause of action, the findings do not support the judgment, and the facts do not show any legal liability. No direct trespass is alleged or claimed, nor is it alleged or claimed that the dam

directly overflowed the land. If injury is merely caused indirectly by lawful act, there can be no recovery in the absence of negligence. The maintenance of a dam in a watercourse of the State of Nevada for the diversion of water for irrigation is a lawful act. (*Bliss* v. *Grayson*, 56 Pac. 231; *Fresno* v. *Fresno Canal Co.*, 98 Cal. 179; *Shoemaker* v. *Hatch*, 13 Nev. 261.)

The complaint fails to state a cause of action, because it contains no allegation that any of the defendants did anything which caused the river to fill with sand, or that the dam was in the river, or of ownership of plaintiff's land when the dam was erected. A person is not responsible for a trespass committed by his predecessor and grantor in the ownership of land.

Where a nuisance is erected upon land, a suit to abate the nuisance cannot be maintained against a grantee of the land unless he is first given notice to abate the same, and in the complaint such notice must be pleaded, and it must be proved at the trial. (2 Farnham on Waters, sec. 566; *Plumer* v. *Harper*, 14 Am. Dec. 333; *Castle* v. *Smith*, 36 Pac. 859.)

Any person has the right under the acts of Congress to erect dams on the public domain, and to back the water up the stream on public land, and successors in interest take the land subject to the easement of the dam. (*Shoemaker* v. *Hatch*, 13 Nev. 26; *Natoma W. & M. Co.* v. *Hancock*, 101 Cal. 42.)

Damages resulting from the doing of a lawful act can be recovered only in case of negligence. (*Williams* v. *Michigan C. R. R. Co.*, 2 Mich. 259, 55 Am. Dec. 59; *Fahn* v. *Reichart*, 8 Wis. 255, 76 Am. Dec. 237; *Brown* v. *Collins*, 53 N. H. 442, 16 Am. Rep. 372; *Hoffman* v. *Tuolumne Water Co.*, 10 Cal. 413; *Wolf* v. *St. Louis Ind. W. Co.*, 10 Cal. 541; *Todd* v. *Cichell*, 17 Cal. 97; *Everett* v. *Hydraulic F. T. Co.*, 23 Cal. 225; *Campbell* v. *Bear River Co.*, 35 Cal. 679; *King* v. *Miles City I. D. Co.*, 16 Mont. 463, 50 Am. St. Rep. 506; *White* v. *Spreckels*, 101 Pac. 920; *Spencer* v. *Campbell*, 9 W. & S. 32; *Losee* v. *Buchanan*, 10 Am. Rep. 623; *Marshall* v. *Welwood*, 38 N. J. L. 339, 20 Am. Rep.

394; *Cosulich* v. *Standard Oil Co.*, 122 N. Y. 118, 19 Am. St. Rep. 475; *Garland* v. *Towne*, 55 N. H. 55; *Hopkins* v. *Nutte Co.*, 13 Mont. 223, 40 Am. St. Rep. 438; 13 Am. & Eng. Ency. Law, 411, 413, 443; *Longabaugh* v. *Virginia City Water Co.*, 9 Nev. 271; *Stewart* v. *Birchfield*, 12 Cal. App. Dec. 203; *Durgin* v. *Neal*, 82 Cal. 595; *Hannahan* v. *St. Paul Co.*, 5 Dak. Tr. 22; *Parrott* v. *Wells*, 15 Wall. 524, 21 L. Ed. 206; *Fleming* v. *Lockwood*, 36 Mont. 384, 122 Am. St. Rep. 375; *Holyoke Water P. Co.* v. *Conn. R. Co.*, 52 Conn. 570; 17 Am. & Eng. Ency. Law, p. 512; *China* v. *Southwick*, 12 Me. 238; *Proctor* v. *Jennings*, 6 Nev. 83; *Smith* v. *Agawam Canal Co.*, 2 Allen, 355; *Shrewsbury* v. *Smith*, 12 Cush. 177; *Livingston* v. *Adams*, 8 Cow. 175; *Baily* v. *Mayor*, 3 Hill, 531, 2 Denio, 433; *Lapham* v. *Curtis*, 5 Vt. 371; *Knoll* v. *Light*, 76 Pa. St. 268; *Moore* v. *Berlin M. Co.*, 74 N. H. 305, 67 Atl. 578, 124 Am. St. Rep. 968.)

A complaint is insufficient to authorize damages on account of the maintenance of a dam, where it fails to allege in general terms, as an ultimate fact, negligence of defendants in maintaining the dam. (*City Power Co.* v. *Fergus Falls*, 128 N. W. 817.)

If a dam is a lawful structure, there is liability for damage to others only in case of negligence. (*Hicks* v. *Drew*, 117 Cal. 305, 49 Pac. 189.)

The court erred in holding that defendants could not object to a question propounded by them in a deposition when offered by the plaintiff, and that a question cannot be objected to on grounds other than those made at the time the deposition was taken. When a deposition has once been taken, it may be read in any stage of the same action or proceeding by either party, and shall be deemed the evidence of the party reading it. (Comp. Laws, 3504, 3505; 6 Ency. Pl. & Pr. 585; *Hatch* v. *Brown*, 63 Me. 410; *In Re Smith*, 34 Minn. 436.)

Defendants were entitled to have the damage proved in a legal and orderly way, circumscribed by the rules of evidence, and any other manner of proving damage was prejudicial to their rights. (*Crow* v. *San Joaquin Co.*,

62 Pac. 562; *Edgerton* v. *Wolf,* 72 Mass. 453; *Roberts* v. *Kendall,* 29 N. E. 487; *Kyle* v. *Craig,* 125 Cal. 107.)

Testimony of witnesses by deposition is subject to the same general rules of exclusion for irrelevancy, immateriality and incompetency, as if it were given in open court. (Am. & Eng. Ency. Law, p. 363; 6 Ency. Pl. & Pr., p. 596.)

Objections to the answers of witnesses made in depositions, as hearsay, secondary, or irrelevant evidence, may be made when the testimony is offered. (*Woolsey* v. *McMahon,* 46 Tex. 63.)

Objections to the competency of deponent, or to the competency of the questions or answers, may be made when the deposition is offered at the trial. (*Leavitt* v. *Baker,* 19 Atl. 86; *Lord* v. *Moore,* 37 Me. 208; *Palmer* v. *Crook,* 73 Mass. 574; *Horseman* v. *Todhunter,* 12 Iowa, 230; Wigmore on Evidence, sec. 18, vol. 1, p. 54; *Laurance* v. *Fulton,* 19 Cal. 683; *Nicholson* v. *Tarpey,* 89 Cal. 617.)

The court erred in its instructions in regard to the contributing causes by acts of third parties. The general rule of law is that when two or more causes concur to produce an effect, and it cannot be determined which contributed most largely, or whether, without the concurrence of both, it would have happened at all, and a particular party is responsible only for the consequences of one of these causes, a recovery cannot be had, because it cannot be judicially determined that the damage would have been done without such concurrence, so that it cannot be attributed to that cause for which he is answerable. (*Marble* v. *City of Worcester,* 4 Gray, 395; *Slater* v. *Mersereau,* 64 N. Y. 138; *Chipman* v. *Palmer,* 77 N. Y. 51; *Schneider* v. *Second Ave. R. R. Co.,* 59 N. Y. Supp. 556; *Blaisdell* v. *Stephens,* 14 Nev. 17; *Sloggy* v. *Dilworth,* 36 N. W. 451, 8 Am. St. Rep. 656; *Swain* v. *Tenn. Co.,* 78 S. W. 93; *Draper* v. *Brown,* 91 N. W. 1001; *Sellick* v. *Hale,* 47 Conn. 260.)

The court erred in the admission of evidence, particularly evidence based upon memorandum. A memorandum to be competent evidence must have been made at

or shortly after the time of the transaction, and it must appear that the witness knew at the time it was made that it was correct. (*State* v. *Bacon*, 98 Am. Dec. 616.)

Declarations of a person through whom the defendant traces his title are inadmissible where the evidence fails to disclose his possession at the time, or whether the declarations were made before or after he parted with his title to the land. (*Harrell* v. *Culpepper*, 47 Ga. 635.) *Prima facie* existence of privity must be shown, as preliminary to admitting statements of persons said to stand in that relation. (*Aiken* v. *Cato*, 23 Ga. 154.)

Evidence essential to plaintiff's recovery cannot be withheld and presented for the first time in rebuttal. (*Moehn* v. *Moehn*, 105 Iowa, 710, 75 N. W. 521.)

The court erred in permitting witnesses to give their opinions on the two ultimate questions in the case.

An expert is a person having special knowledge and skill in the particular calling to which the inquiry relates. (*Hammond* v. *Woodman*, 66 Am. Dec. 228; Rogers, Expert Testimony, p. 2; 3 Words & Phrases, p. 2594; *Wright* v. *Williams Estate*, 47 Vt. 222, 233.)

To render opinions of witness admissible on ground that he is an expert, he must have special skill in the subject concerning which his opinion is sought to be given. (Lawson, Expert and Opinion Evidence, p. 231, and cases.)

Opportunity for observation, without special study and attention, is insufficient to qualify one as an expert. (*Page* v. *Parker*, 40 N. H. 59; *Goldstein* v. *Black*, 50 Cal. 462.)

Opinion is entitled to no weight with a court or jury unless it comes from persons who first give satisfactory evidence that they are possessed of such experience, skill, or science in such matters as entitles their opinions to pass for scientific truth. (*Carr* v. *The Northern Liberties*, 35 Pa. St. 324.)

When all the facts upon which the opinion is founded can be ascertained and made intelligible to the court or jury, the opinion of the witness is not to be received in

evidence. (*Sappenfield* v. *Main St. Ry. Co.*, 91 Cal. 48, 60; *Parkin* v. *Grayson-Owen Co.*, 157 Cal. 41; Wigmore on Evidence, sec. 1918, p. 2552.)

All the facts within the knowledge of the witnesses, and upon which they based the opinions they were allowed to give to the jury, could not be justified as lay opinions, and were erroneously admitted. (*Railroad Co.* v. *Yarborough*, 20 S. W. 515; *Railroad Co.* v. *Cook*, 57 Ark. 387, 21 S. W. 1066; *Indianapolis T. & T. Co.* v. *Kidd*, 167 Ind. 402, 79 N. E. 347, 7 L. R. A. n. s. 143; *American T. & T. Co.* v. *Green*, 73 N. E. 707; *Commonwealth* v. *Sturtivant*, 117 Mass. 122; *Loshbaugh* v. *Birdsall*, 90 Ind. 466; *Road* v. *Leonhardt*, 5 Atl. 346; *Mann* v. *State*, 3 South. 207; *Hurt* v. *Railroad Co.*, 7 S. W. 1; *Railroad Co.* v. *Fox*, 6 S. W. 569; *Stephenson* v. *State*, 11 N. E. 360; *Baltimore & O. R. R. Co.* v. *Schultz*, 1 N. E. 324; *Shaw* v. *Jones*, 133 Ga. 446, 66 S. E. 240; *Tenn. C. & I. Co.* v. *Kelly*, 50 South. 1008.)

In no case can a witness be permitted to give testimony on the subject of cause and effect; the facts must be presented to the jury, who will determine the cause of the injury. (*Chicago Co.* v. *Ross*. 24 Ind. App. 222, 56 N. E. 451; *Farbush* v. *Maryland Casualty Co.*, 91 N. W. 135; *Hillje* v. *Hettich*, 67 S. W. 90; *White* v. *Farmers M. L. I. Co.*, 97 Mo. App. 590, 71 S. W. 707; *Wright* v. *Commonwealth*, 72 S. W. 340; *Nichol* v. *Oregon S. L. R. Co.*, 27 Utah, 240, 70 Pac. 996; *Dyshane* v. *Benedict*, 120 U. S. 630; *Ouverson* v. *Grafton*, 65 N. W. 676.)

It is clearly erroneous to permit a witness to give his conclusion on the ultimate fact in a case, except it be on a matter which is the subject of expert testimony. (*In Re Coburn*, 105 Pac. 924, 932.)

Where a witness gives inferences from facts not personally observed by him, it is necessary that the data upon which he bases his inference be specified by him, and stated as assumed or hypothetical. (Greenleaf on Evidence, sec. 441k.)

A party against whom expert evidence is offered is entitled to have an explicit statement made to or by the

expert witness of the precise facts upon which his opinion is based. (*Connelley* v. *Railroad Co.*, 15 N. Y. Supp. 176.)

Hypothetical presentation is necessary where the premises are not supplied by the witness himself. (Wigmore on Evidence, sec. 676; *Polk* v. *State*, 36 Ark. 117, p. 124; *Williams* v. *Brown*, 28 Ohio St. 547-51; Rogers, Expert Testimony, sec. 27, p. 64; *Muldowney* v. *Ill. Central*, 39 Iowa, 615; *Western Union* v. *Morris*, 73 Pac. 108; *Southern B. T. Co.* v. *Jordan*, 13 S. E. 202; *Flaherty* v. *Powers*, 44 N. E. 1074; *State* v. *Durrant*, 116 Cal. 179.)

A hypothetical question must be based on facts which there is evidence to prove, and a question which does not state the facts is improper. (*Russ* v. *Wabash W. R. R. Co.*, 112 Mo. 45, 20 S. W. 472, 18 L. R. A. 823; *Galveston Co.* v. *Noelke*, 125 S. W. 969.)

The jury should know upon what basis of facts the opinion is founded. (*Wetherbee Heirs* v. *Wetherbee*, 38 Vt. 454; *Williams* v. *Brown*, 28 Ohio St. 547.)

The opinion must not be based on information gained from the statements of others obtained out of court, for such an opinion would be based upon mere hearsay. (*Polk* v. *State*, 36 Ark. 117; Lawson, Expert and Opinion Evidence, p. 266; *Heald* v. *Thing*, 45 Me. 392; *State* v. *Pike*, 65 Me. 111; *Flaherty* v. *Powers*, 167 Mass. 61.)

When plaintiff consents to an act he cannot subsequently treat it as a trespass, nor recover damages therefor. (*Cadwell* v. *Farrell*, 28 Ill. 438; *Ashcroft* v. *Cox*, 50 S. W. 986; *Law* v. *Nettles*, 2 Bailey L. 447; *Brown* v. *Armstrong*, 102 N.W. 1047; *Vanneat* v. *Fleming*, 44 N.W. 906; 28 Am. & Eng. Ency. Law, p. 560; *Churchill* v. *Bauman*, 95 Cal. 541, 104 Cal. 369.)

When a landowner permits an appropriator of water for a number of years to enter upon his land for the purpose of constructing a dam, he will be estopped by such acquiescence from thereafter treating the appropriator as a trespasser and denying his right of entry. (*Miller* v. *Douglas*, 60 Pac. 722.)

When a dam is acquiesced in for years, the prescriptive right to keep the water out of the stream below is as

much entitled to protection as the right to object to it backing up above. (*Burk* v. *Simonson*, 104 Ind. 173; *Brown* v. *Armstrong*, 102 N. W. 1047.)

A parol license to construct or maintain a dam on the licensor's land is valid and cannot be revoked after licensee has made valuable improvements on the faith of the license. (*Garrett* v. *Bishop*, 41 Pac. 10; *Bowman* v. *Bowman*, 57 Pac. 547; *Lee* v. *McLeod*, 12 Nev. 280; *Snowden* v. *Wilas*, 19 Ind. 10; *Curtis* v. *LaGrande W. Co.*, 23 Pac. 809; *McBroom* v. *Thompson*, 37 Pac. 57; *Sumpter Ry. Co.* v. *Gardner*, 90 Pac. 499; *Flickinger* v. *Shaw*, 87 Cal. 126; *Grimshaw* v. *Belcher*, 88 Cal. 217.)

A person operating under a parol license is not liable for damages done in pursuance thereof. (*Grimshaw* v. *Belcher*, 88 Cal. 217; *Botles* v. *Mercer*, 53 Cal. 667; 2 Farnham on Waters, sec. 557; *Ogle* v. *Diel*, 55 Ind. 130; *Cobb* v. *Slimmer*, 45 Mich. 178, 7 N.W. 806; *Cook* v. *Pridgen*, 45 Ga. 331, 12 Am. Rep. 582.)

Where a person acquires land on which a dam is constructed and upon which there is an easement in favor of other land of the grantor, a conveyance of the land does not destroy the easement. (2 Farnham on Waters, sec. 555a.)

Where a person has delayed to object to a trespass or nuisance, he cannot obtain equitable relief. (2 Farnham on Waters, sec. 582c; *Heilman* v. *Lebanon Co.*, 34 Atl. 647; *Clarke* v. *Cambridge Irr. Co.*, 64 N. W. 239; *Kinkaid* v. *Indianapolis Co.*, 24 N. E. 1066; *Penn Co.* v. *Austin*, 168 U. S. 685; *Keeling* v. *Pittsburg Co.*, 54 Atl. 485; *McAulay* v. *West Co.*, 33 Vt. 311; *Holt* v. *Parsons*, 45 S. E. 690; *Goodin* v. *Cincinnati Co.*, 18 Ohio St. 169; *Pensacola R. Co.* v. *Jackson*, 21 Fla. 146.)

Where a public use has attached to water, a party will not be entitled to the equitable relief of an injunction where he has stood by and permitted the public right to attach. (*Fresno Co.* v. *Southern Pacific*, 135 Cal. 202; *Southern Cal. Ry. Co.* v. *Slauson*, 138 Cal. 342; *Katz* v. *Walkinshaw*, 141 Cal. 116, 136; *Crescent Canal Co.* v. *Montgomery*, 143 Cal. 248; *Montecito Valley Co.* v.

*Santa Barbara,* 144 Cal. 578; *Newport* v. *Temescal W. Co.,* 149 Cal. 531; *Barton* v. *Water Co.,* 155 Cal. 509.)

Where an easement over land is enjoyed for the period of five years openly, notoriously, uninterruptedly and continuously under a claim of right and adversely to the owner of the land, a prescriptive right to maintain it without liability for damages is acquired. (*Anthony* v. *Kennard Bldg. Co.,* 87 S. W. 921; *Branch* v. *Doane,* 17 Conn. 402, 409; *Ellington* v. *Bennett,* 59 Ga. 286; *Cowell* v. *Thayer,* 5 Metc. 253; *Virginia Hot Springs Co.* v. *McCrae,* 106 Va. 461; 10 Am. & Eng. Ann. Cases, 179; *Voter* v. *Hobbs,* 69 Me. 19; *Ray* v. *Fletcher,* 12 Cush. 200; *Jackson* v. *Harrington,* 2 Allen, 242; *Gehman* v. *Erdman,* 105 Pa. St. 371; *McGeorge* v. *Hoffman,* 135 Pa. St. 381, 19 Atl. 413; *Lucas* v. *Marine,* 40 Ind. 289; *Grigsby* v. *Clear Lake W. Co.,* 40 Cal. 396; *Gulf Co.* v. *Moseley,* 161 Fed. 72, 20 L. R. A. n. s. 885; *Turner* v. *Overton,* 86 Ark. 406, 111 S. W. 270, 20 L. R. A. n. s. 894; *Robinson* v. *Southern C. R. Co.,* 129 Cal. 8; *Williams* v. *Southern Pac. R. R. Co.,* 150 Cal. 624.)

If the acts of plaintiff contributed to cause the injury complained of, defendant is not liable for the trespass. (*Richards* v. *Peter,* 38 N. W. 278; *Emery* v. *Railroad,* 109 N. C. 589; *Grant* v. *Kugler,* 81 Ga. 637, 12 Am. St. Rep. 348; *Turner* v. *Overton,* 86 Ark. 406, 111 S. W. 270; 20 L. R. A. n. s. 894; *Proctor* v. *Jennings,* 6 Nev. 83.)

The injunction should merely have regulated the height of the dam. The act prohibited must be the doing of some tangible or distinct thing or series of things, to be clearly pointed out or described. (*Lawrie* v. *Lawrie,* 9 Paige, 233; *St. Louis Co.* v. *Montana M. Co.,* 58 Fed. 129; *Regan* v. *Sorensen,* 100 N. W. 1095; *Governor* v. *Wiley,* 14 Ala. 172; *Baldwin* v. *Miles,* 58 Conn. 496, 20 Atl. 618; *Moat* v. *Holbein,* 2 Edw. Ch. N. Y. 188; *Sullivan* v. *Judah,* 4 Paige, 444; *Arthur* v. *Oakes,* 63 Fed. 310, 327.)

Where a person is engaged in a lawful business, it is not proper in any case to absolutely enjoin and abate

the same, but it should be regulated or abated merely to the extent which is necessary to prevent damage. (*Shepard* v. *People,* 40 Mich. 487; *Byers* v. *Colonial Irr. Co.,* 134 Cal. 553; *Fresno* v. *Fresno Canal Co.,* 98 Cal. 179; *McMenomy* v. *Band,* 87 Cal. 134; *Lorenz* v. *Waldron,* 96 Cal. 243, 249.)

The complaint must allege that the dam is a nuisance. (*Androscoggin R. Co.* v. *Androscoggin R. Co.,* 49 Me. 392.) It must also allege the height of the dam claimed to be a nuisance. (*Tye* v. *Catching,* 78 Ky. 463; 14 Ency. Pl. & Pr., p. 1148.)

The lower court erred in setting aside the judgment entered upon the verdict. By that judgment the power of the court was exhausted, and it had no power to enter another and different judgment. (*Ophir M. Co.* v. *Carpenter,* 4 Nev. 534; *Castle* v. *Smith,* 36 Pac. 859; Rule XLV, District Court; *Bliss* v. *Grayson,* 24 Nev. 422.)

Before a court can abate a dam, all parties interested must be made parties to the action. (*Castle* v. *Madison,* 89 N. W. 156; *Eastman* v. *St. Anthony Falls Co.,* 12 Minn. 137; *O'Sullivan* v. *New York E. R. Co.,* 7 N. Y. Supp. 51; *Martin* v. *Blattmer,* 68 Iowa, 286; *Brady* v. *Weeks,* 3 Barb. 157; *Irvine* v. *Wood,* 51 N. Y. 224; *Taylor* v. *Metropolitan E. R. Co.,* 50 N. Y. Sup. Ct. 311; *Bliss* v. *Grayson,* 24 Nev. 422; *Robinson* v. *Kind,* 23 Nev. 330.)

The court should have permitted defendants to file supplemental answers setting up the alleged settlement with other parties. It is well settled that the release of one joint tort-feasor releases all of the persons liable. (24 Am. & Eng. Ency. Law, p. 306; *Chetwood* v. *California Nat. Bank,* 113 Cal. 414, 426.)

The memorandum of costs, not having been filed within the statutory time, should have been stricken out. (*Howard* v. *Richards,* 2 Nev. 128; *Sholes* v. *Stead,* 2 Nev. 107.)

The court erred in admitting evidence of witnesses as

to amount of damages suffered by plaintiff, and in permitting witnesses to give their opinions as to the value of land based on productiveness. Damages cannot be proved by asking a witness how much a thing is or was damaged. (*Upcher* v. *Overlender*, 50 Kan. 315, 31 Pac. 1080; *Howell* v. *Medler*, 41 Mich. 641, 2 N. W. 911; *International R. Co.* v. *Fickey*, 125 S. W. 327; *Brown* v. *Providence Ry. Co.*, 12 R. I. 238; *Tingley* v. *Providence*, 8 R. I. 493; *Louisville Ry. Co.* v. *Sparks*, 40 N. E. 546; *Van Deusen* v. *Young*, 29 N. Y. 20; *Tenn. Coal Co.* v. *McMillan*, 49 South. 880; Lawson, Expert Evidence, 491; Greenleaf, Evidence, sec. 430; *Central of Georgia* v. *Barnett*, 44 South. 392.)

If the witnesses are qualified, they may give their opinions as to the value before and after the event causing the damage. (*Roberts* v. *N. Y. El. Ry. Co.*, 128 N. Y. 455, 28 N. E. 486; *Louisville Ry. Co.* v. *Sparks, supra;* 2 Sutherland on Damages, sec. 444.)

Evidence of value should be confined to what the property is worth in the open market, having regard to the most valuable use to which it may be put. (*Santa Ana* v. *Harlin*, 99 Cal. 538; *Spring Valley Co.* v. *Drinkhouse*, 92 Cal. 528.)

The court erred in overruling challenges to jurors. The constitution of Nevada secures to every one the right of trial by jury. The term "jury" means twelve men who are not interested in the event of the suit. (*State* v. *McClear*, 11 Nev. 39.) To be competent they should stand indifferent. (*Fleeson* v. *Savage S. M. Co.*, 3 Nev. 157, 161.) General hostility between a juror and a party, without any connection with the action to be tried, is a good cause of challenge. (*Brittain* v. *Allen*, 13 N. C. 120; 24 Cyc. 287; *Fleming* v. *State*, 11 Ind. 235; *Commonwealth* v. *Mosier*, 19 Atl. 943; *Mining Co.* v. *Showers*, 6 Nev. 291; *Lombardi* v. *Cal. S. R. Co.*, 124 Cal. 31; *Omaha S. R. Co.* v. *Craig*, 58 N. W. 209.)

Temporary interruption by plaintiff of the enjoyment of an easement by defendant, and without defendant's knowledge, is not sufficient to stop the running of the

statute and the acquisition of a prescriptive right, or to take away a prescriptive right already acquired. (*McKenzie* v. *Elliott,* 134 Ill. 156, 24 N. E. 965; *Webster* v. *Lowell,* 142 Mass. 324; *Putnam* v. *Bowker,* 11 Cush. 542; *Connor* v. *Sullivan,* 40 Conn. 26, 16 Am. Rep. 10; *Wilkens* v. *Barnes,* 1 Ky. L. Rep. 328.)

Where a finding of fact is defective, and it has been excepted to in the court below, the supreme court will reverse the case for such defect. (*Whitmore* v. *Shiverick,* 3 Nev. 288.)

The owner of the servient estate can have a right of action only where there is an unauthorized use of the easement, or where the owner of the easement exceeds his right in the manner or to the extent of its use. (14 Cyc. 1215.)

It is a physical impossibility for a dam to cause an overflow at points up stream from four to eleven feet higher than the bank of the river at the dam, as in this case. (*Lowery* v. *San Joaquin Co.,* 134 Cal. 185.)

Testimony that is contrary to the known and settled laws of nature will be rejected by the court, and does not need any contradiction. (*Daggers* v. *Van Dyck,* 37 N. J. Eq. 130, 132; Moore on Facts, vol. 1, sec. 149; *Tillson* v. *Maine C. R. Co.,* 67 Atl. 407; *Waters-Pierce Oil Co.* v. *Knisel,* 96 S. W. 342.)

Plaintiffs cannot recover where their own acts and negligence contributed to the injury. (*Malmstrom* v. *People's Drain Ditch Co.,* 32 Nev. 246.)

*Mack & Green,* for Respondent:

The complaint is clearly sufficient. (*Begein* v. *Anderson,* 28 Ind. 79; *Adams* v. *Michael,* 38 Md. 123, 17 Am. Rep. 516; *Dunn* v. *Austin,* 77 Tex. 139, 11 S. W. 1125; *Bowen* v. *Mauzy,* 117 Ind. 258, 19 N. E. 526; *Bordeaux* v. *Greene,* 22 Mont. 254, 56 Pac. 218, 74 Am. St. Rep. 600; Ency. Pl. & Pr. 1109, 1141; 29 Cyc. 1241–1242; *Laflin Rand Power Co.,* 131 Ill. 322, 23 N. E. 389; *Sullivan* v. *Waterman,* 20 R. I. 134.)

There is in this state but one form of action; technical

distinctions between forms of action as they existed at common law have been abolished. (Comp. Laws, 3996; *Jones* v. *Steamboat*, 17 Cal. 487; *Rogers* v. *Duhart*, 97 Cal. 500; *Fraler* v. *Sears Union Water Co.*, 12 Cal. 555.)

The complaint in actions under our code shall contain a statement of the facts constituting the cause of action, in ordinary and concise language. (Comp. Laws, 3134; Pomeroy, Code Remedies, 4th ed. sec. 49, p. 75.)

In the selection of a jury, the determination of the trial court as to the existence or nonexistence of a general feeling against the defendants is final and conclusive. (*Bernou* v. *Bernou*, 114 Pac. 1000; *Galveston* v. *Nicholson*, 57 S. W. 693; *Barfield* v. *Coker*, 53 S. E. 170; *Thompson* v. *Autry*, 57 S. W. 47; *Mo. K. & T. Ry. Co.* v. *Elliott*, 102 Fed. 96, 42 C. C. A. 188; *Creditors* v. *Welch*, 55 Cal. 469; *People* v. *Findley*, 64 Pac. 472, 132 Cal. 301; *Clausen* v. *State*, 36 Atl. 886; *Huntley* v. *Territory*, 54 Pac. 314; 3 Cyc. 333; *Estes* v. *Richardson*, 6 Nev. 128.)

A juror is not incompetent because he has a suit pending against the same defendants growing out of an entirely different subject-matter. (*San Antonio* v. *Diaz*, 64 S. W. 549; *Southern Railway Co.* v. *Oliver*, 102 Va. 710, 47 S. E. 862.)

A juror is not incompetent because he formerly had a similar suit against the same defendants, or is defendant in a similar suit brought by the same plaintiff. (*Missouri Ry. Co.* v. *Elliott*, 51 S.W. 1067; *Austin* v. *Cox*, 60 Ga. 520.)

Even a relationship to a witness does not disqualify a juror, much less a mere acquaintance with the witness. (*Faith* v. *City of Atlanta*, 78 Ga. 779, 4 Atl. 3; *Stewart* v. *Ry. Co.*, 136 Ky. 717, 125 S. W. 154.)

A mere hypothetical opinion based upon hearsay information and not raised by witnesses does not disqualify a talesman. (*People* v. *Murphy*, 45 Cal. 137; *People* v. *Williams*, 17 Cal. 142; *State* v. *Williams*, 28 Nev. 395.)

Where the dam of a lower proprietor causes the deposit of sand, sediment, and debris in a stream, resulting in the overflow of the lands of an upper proprietor, the former is liable for any resulting damage. (*Hagge* v. *Kansas City*

*S. R. Co.*, 104 Fed. .391; *Turner* v. *Lacy,* 37 Or. 158, 67 Pac. 342; *Athens Mfg. Co.* v. *Rucker,* 80 Ga. 291, 3 S. E. 885; *Schuylkill N. Co.* v. *McDonough,* 33 Pac. 73; *Blizzard* v. *Danville,* 34 Atl. 846; *Ames* v. *Dorset M. Co.*, 64 Vt. 10, 23 Atl. 857; *Talbot* v. *Whipple,* 7 Gray, 122; *Davis* v. *Fuller,* 12 Vt. 178, 36 Am. Dec. 334; *Cowels* v. *Kidder,* 24 N. H. 364, 54 Am. Dec. 287; *Cline* v. *Baker,* 118 N. C. 780, 24 S. E. 516; *Hardin* v. *Ledbetter,* 103 N. C. 90, 9 S. E. 641; Farnham on Waters, vol. 2, sec. 567, p. 1820; sec. 570, pp. 1832, 1833.)

Both at common law and in the United States a natural stream cannot be disturbed by a lower proprietor to the detriment of those above him. (*Kroeger* v. *Twin Buttes,* 114 Pac. 553; *Herriman* v. *Finan,* 133 N. Y. Supp. 1034; *Colket* v. *Verner,* 84 Atl. 775, 236 Pa. 285.)

The construction of a solid dam in the river evinced a wanton disregard of the upper proprietor's rights, and imposed liability upon the defendants. (*Jones* v. *Fisher,* 17 Can. S. C. 513; *Ramsale* v. *Foote,* 55 Wis. 557, 13 N. W. 557; *Hass* v. *Choussard,* 17 Tex. 588; *Masonic T. Assn.* v. *Banks,* 94 Va. 695, 27 S. E. 490; *Wilhelm* v. *Burleyson,* 106 N. C. 381, 11 S. E. 590; *Moffett* v. *Brewer,* 1 Greene, 349; *Delaney* v. *Boston,* 2 Harr. 489; *Morris* v. *Commander,* 25 N. C. 510; *Miller* v. *Slowman,*. 26 Ind. 143; *Coloney* v. *Farrow,* 91 Hun, 82, 36 N. Y. S. 164; *Winchell* v. *Clark,* 68 Mich. 64, 35 N. W. 907; *Boatner* v. *Henderson,* 5 Mart. 186; *Hill* v. *Ward,* 7 Ill. 285; *Brown* v. *Bowen,* 30 N. Y. 519, 86 Am. Dec. 406; *Little* v. *Slamtack,* 63 N. C. 285; *Thompson* v. *Crocker,* 9 Pick. 59; *Sims* v. *Smith,* 7 Cal. 149, 68 Am. Dec. 233; note to 59 L. R. A. 817 and 28 L. R. A. n. s. 156.)

Even if the erection and maintenance of the dam in question was a lawful act or business, it constitutes no excuse for a nuisance that causes injury to another. (21 Am. & Eng. Ency. Law, 2d ed. 689; *Scott* v. *Day,* 3 Md. 431; *Railroad* v. *Angel,* 41 N. J. Eq. 316, 7 Atl. 432, 56 Am. Rep. 1; *Ross* v. *Butler,* 19 N. J. Eq. 294, 97 Am. Dec. 654; *Friedman* v. *Columbia M. Works,* 91 N. Y. S. 129; *Barrick* v. *Schifferdecker,* 1 N. Y. S. 21; *Catlin* v. *Patterson;*

10 N. Y. St. 724; *Mulligan* v. *Elias*, 12 Ab. Pr. n. s. 259; *Barkau* v. *Knecht*, 9 Ohio Dec. 66; *Rodenhausen* v. *Craven*, 141 Pa. St. 546, 23 Atl. 774; *Ducktown S. Co.* v. *Barnes*, 60 S. W. 593; *Nevill* v. *Mitchell*, 66 S. W. 579; *People* v. *Burtleson*, 47 Pac. 817; *Jung B. Co.* v. *Commonwealth*, 96 S. W. 595; *Attorney-General* v. *Stewart*, 20 N. J. Eq. 415; *Cleveland* v. *Citizen's G. Co.*, 20 N. J. Eq. 201; *Rilley* v. *Curley*, 75 N. J. Eq. 57, 71 Atl. 700; *Lumber Co.* v. *Sharp*, 123 S. W. 370.)

The creation and maintenance of a nuisance is an actionable wrong, and therefore unlawful. (Comp. Laws, 3346; Stats. 1901, 39.)

One who wrongfully causes water to flow upon another's land, which would not flow there naturally, creates a nuisance. (29 Cyc. 1178; *Oil Co.* v. *Jackson*, 91 N. E. 825; *Andette* v. *O'Cain*, 39 Kan. 103.)

Whether the maintenance of the dam was a nuisance was a question of fact for the jury and the trial court, and their determination is conclusive. (21 Am. & Eng. Ency. Law, 619.)

No notice that the dam constituted a nuisance was necessary to charge defendants with liability. (29 Cyc. 1233.)

They had actual knowledge of the existence of the dam and of the insufficiency of the river to carry the waters, which rendered notice unnecessary. (Farnham on Waters, sec. 566.)

A person obstructing a watercourse is liable for damage caused by extraordinary floods, where such or similar floods have occurred in the past, although at irregular and uncertain periods. (*Ohio Ry. Co.* v. *Ramey*, 139 Ill. 9; *Union Trust Co.* v. *Cuppy*, 26 Kan. 754; *Atchison Ry. Co.* v. *Herman*, 74 Kan. 77, 85 Pac. 817; *Gray* v. *Harris*, 107 Mass. 492; *New York* v. *Bailey*, 2 Denio, 433; *Graham* v. *Chicago I. & L. Co.*, 39 Ind. App. 294, 77 N. E. 57, 1055; *Howard* v. *Buffalo*, 122 N. Y. Supp. 1095.)

Liability for a nuisance exists regardless of negligence of the parties creating it. (29 Cyc. 1155; *Athens*

*M. Co.* v. *Rucker,* 80 Ga. ·291, 4 S. E. 885; *Curtiss* v. *Eastern R. R. Co.,* 98 Mass. 428; *Wilson* v. *New Bedford,* 108 Mass. 261; *Eason* v. *Wattier,* 25 Or. 7, 34 Pac. 756; *Texas Ry. Co.* v. *O'Mahoney,* 60 S. W. 902; *Pikley* v. *Clark,* 35 N. Y. 520; *Cahill* v. *Eastman,* 18 Minn. 324; *Kanakee W. Co.* v. *Reeves,* 45 Ill. App. 285; *Fuller* v. *Chicopee M. Co.,* 16 Gray, 46; *Schoot* v. *Longwell,* 138 Mich. 12.)

The question of negligence is not involved in an action for the erection and maintenance of a nuisance. (29 Cyc. 1155; *Risher* v. *Coal Co.,* 124 N. W. 764; *Marble Co.* v. *Gas Co.,* 128 Mo. App. 96, 106 S. W. 94; *Cahill* v. *Eastman,* 10 Am. Rep. 184.)

Direct injury and liability exist, regardless of negligence. (*Wine* v. *N. P. Ry. Co.,* 136 Pac. 387.)

An action for obstructing the flow of water by raising the height of a dam on the stream below is not a suit for negligence, but for wrongful acts, and the doctrine of contributory negligence does not apply. (*Williamson* v. *Yingling,* 80 Ind. 379; *Athens M. Co.* v. *Rucker,* 80 Ga. 291, 4 S. E. 885.)

It was the duty of defendants to maintain the dam at such a height only as would not cause the river to overflow, even though the dam might have been originally constructed at a greater height. (*Missouri, K. & T. Ry. Co.* v. *Johnson,* 126 Pac. 567; *Saenger* v. *Harris,* 120 Pac. 1117; *Patajanueni* v. *Washington Power Co.,* 124 Pac. 783.)

Defendants acquired no prescriptive right to overflow plaintiff's lands by the erection of a dam that did not overflow them. The prescriptive period commenced to run only when the lands were first overflowed. The overflow constituted the wrongful trespass, and not the erection of the dam. (*Iowa Power Co.* v. *Hoover,* 147 N. W. 858; *Shearer* v. *Hutterische,* 134 S. W. 63; *Boynton* v. *Longley,* 19 Nev. 69; *Ellington* v. *Bennett,* 59 Ga. 286; *Postlethwaite* v. *Payne,* 8 Ind. 104; *Whitehair* v. *Brown,* 80 Kan. 297; *Turner* v. *Hart,* 71 Mich. 128, 38 N. W. 890, 15 Am. St. Rep. 243; *Miller* v. *Belleville*

*Bank,* 148 Mich. 339, 111 N. W. 1062; *Griffin* v. *Bartlett,* 55 N. H. 119; *Morris* v. *Commander,* 25 N. C. 510; *Lynch* v. *Troxell,* 207 Pa. St. 162, 56 Atl. 413; *Sabin* v. *Johnson,* 35 Wis. 185; *King* v. *U. S.,* 59 Fed. 9.)

By claiming a prescriptive right, appellants adopt as their own all of the acts of their codefendants and predecessors. (*Wills* v. *Babb,* 222 Ill. 95, 78 N. E. 42.)

A party claiming a prescriptive right who enlarges the use cannot at the end of the period of limitations claim the use as enlarged and extended. (*Boynton* v. *Longley,* 19 Nev. 76.)

Plaintiff was not required to commence action to abate the nuisance or to recover damages until the dam became a nuisance and injury ensued. (*Gorman* v. *Trice,* 79 Ga. 731, 5 S. E. 129; *Sumner* v. *Tilston,* 7 Pick. 198; *Ohio & M. R. Co.* v. *Nuerzel,* 43 Ill. App. 108; *Ward* v. *Ward,* 22 N. J. L. 699; *Russell* v. *Turner,* 59 Me. 256; *Gleason* v. *Tuttle,* 46 Me. 288; *Economy L. & P. Co.* v. *Cutting,* 49 Ill. App. 422; *Wilson* v. *Wilson,* 2 Vt. 68.)

Appellants were liable for damage and subject to injunction, even though the dam was constructed and maintained under state or federal authority. (*Sheffield Car. Co.* v. *Constantine H. Co.,* 137 N. W. 305; *Van Wie* v. *Southern W. P. Co.,* 134 N. W. 828.)

There was no error in admitting the testimony of witnesses offered to connect facts with cause and effect. They were competent as experts, and the subject was one concerning which expert testimony might be given. (*Congress Spring Co.* v. *Edgar,* 99 U. S. 645; *McLeod* v. *Lee,* 17 Nev. 122; *Grigsby* v. *Clear Lake W. Co.,* 40 Cal. 404; *Bell* v. *Hardesty,* 16 Pac. 80; *Ohio & M. Ry. Co.* v. *Webb,* 32 N. E. 527; *St. L. Ry.* v. *Lyman,* 22 S. W. 170; 2 Ency. of Ev., p. 952.)

The court, in considering the sufficiency of the evidence to support findings by the court or verdict by the jury, will take the part of the evidence which most strongly bears for the successful party. (*Little* v. *Gorman,* 114 Pac. 321; *Hills* v. *Edmund Peycke,* 110 Pac.

1088; 3 Cent. Dig., secs. 3762–3897; 2 Dec. Dig., secs. 931–989.)

Actual observation of witnesses having practical experience has often been held entitled to greater weight than opinions based upon levels and measurements, and deposit of sand and dead water has frequently been held to interrupt the current of a stream far above the theoretical level. (*Hand* v. *Catawba P. Co.*, 144 Mich. 370, 115 Am. St. Rep. 453; *Turner* v. *Hart*, 71 Mich. 128, 38 N. W. 890, 15 Am. St. Rep. 243; *Mill Co.* v. *Green*, 58 Iowa, 86, 12 N. W. 128; *Brown* v. *Bush*, 45 Pa. St. 61; Merriman's Hydraulics, 1906, p. 325.)

Plaintiff had no cause for action for the abatement of the dam until the dam became a nuisance. (*Eastman* v. *Power Co.*, 12 Minn. 137; *Prentiss* v. *Wood*, 132 Mass. 486; *King* v. *U. S.*, 59 Fed. 9; *Culver* v. *Chicago*, 38 Mo. App. 365; *Thornton* v. *Turner*, 11 Minn. 336; *Roundtree* v. *Brantley*, 34 Ala. 544, 73 Am. Dec. 470; *Chicago* v. *Andreesen*, 62 Neb. 456, 87 N. W. 167; *Union Trust Co.* v. *Cuppy*, 26 Kan. 754; *Delaware Co.* v. *Wright*, 21 N. J. L. 469.)

An easement to overflow the lands of an upper proprietor may be acquired by prescription; but appellants never acquired an easement to overflow the lands of plaintiff, either by grant or prescription, and the jury and the trial court so found. (2 Farnham on Waters, sec. 551.)

The instructions correctly stated the law as applied to the facts of the case. The statute did not begin to run against plaintiff's cause of action until his lands were overflowed as a result of the dam. (*Boynton* v. *Longley*, 19 Nev. 76; *Grigsby* v. *Clear Lake W. Co.*, 40 Cal. 396; *Authurs* v. *Bryant*, 22 Nev. 242; *L. & W. Co.* v. *Hancock*, 85 Cal. 226; *Cave* v. *Crafts*, 53 Cal. 135; *Smith* v. *Russ*, 84 Am. Dec. 739; *Prentiss* v. *Wood*, 132 Mass. 486; *Culver* v. *Chicago Co.*, 38 Mo. App. 365; *Thornton* v. *Turner*, 11 Minn. 237; *Hampstead* v. *Cargill*, 48 Mo. 558; *Chicago* v. *Andree*, 87 Mo. 167; *Union*

*Trust Co.* v. *Cuppy,* 26 Kan. 754; *Roundtree* v. *Brantley,* 73 Am. Dec. 470; *King* v. *U. S.,* 59 Fed. 9; Farnham on Waters, sec. 586; *Shumway* v. *Simons,* 1 Vt. 53; *Gilford* v. *W. Lake Co.,* 52 N. H. 262; *Ohio & M. R. Co.* v. *Wachter,* 23 Ill. App. 415; *Jones* v. *U. S.,* 48 Wis. 385, 4 N. W. 519; *Turner* v. *Hart,* 15 Am. St. Rep. 243; *Brown* v. *Bush,* 45 Pa. St. 61.)

Respondent was entitled to the injunction granted by the trial court. (*Harriman* v. *Finen,* 133 N. Y. Supp. 1034; *Sheffield Car Co.* v. *Constantine H. Co.,* 137 N. W. 305; *Taylor* v. *Rudy,* 137 S. W. 574; *Bramley* v. *Jordon,* 133 N. W. 706; *Shearer* v. *Hutterische Geneinde,* 134 N. W. 63.)

An injunction is sufficiently definite if it is possible for those enjoined to ascertain the acts enjoined. (*Sullivan* v. *Judah,* 4 Paige Ch. 444; *Ballantine* v. *Webb,* 47 N. W. 485; *Robinson* v. *Clapp,* 65 Conn. 365, 29 L. R. A. 582; 22 Cyc. 958; *Oehler* v. *Levy,* 234 Ill. 595, 85 N. E. 271; *Sprague* v. *Kanes F. E. Co.,* 144 N. Y. Supp. 152; *Stiles* v. *Hooker,* 7 Cow. 266; *Marcly* v. *Shults,* 29 N. Y. 346.)

There could be no appeal from the judgment, because it was not taken within one year. (Comp. Laws, 3425; *Solomon* v. *Fuller,* 13 Nev. 276.)

Time cannot be extended by order of court or stipulation of parties; and after expiration of the time limited by statute, the court loses jurisdiction of the cause. (*Brown* v. *Green,* 65 Cal. 221; *Williams* v. *Long,* 130 Cal. 58; *McDonald* v. *Lee,* 132 Cal. 252; Spelling, New Trials, sec. 543; Hayne, New Trials and Appeals, sec. 204; 2 Cyc. 799–800.)

A party cannot appeal from an order or decision when the order or decision is correct, so far as his interests are concerned. (*Daniel* v. *Daniel,* 39 Ark. 266; *Porter* v. *Singleton,* 28 Ark. 483; *Scotland* v. *East Branch M. Co.,* 56 Cal. 625; *Hudson* v. *Hudson,* 84 Ga. 611, 10 S. E. 1098; *Chicago* v. *Cameron,* 120 Ill. 447, 11 N. E. 899; *Simms* v. *Lloyd,* 58 Md. 477; *Hoops* v. *McNichols,* 38 Neb. 76, 57 N. W. 721; *Hyatt* v. *Dusenbury,* 106 N. Y. 663, 12 N. E. 711; *Bullard* v. *Kenyon,* 78 Hun, 26, 29

N. Y. Supp. 772; *Lyon* v. *Allison,* 1 Watt, 161; *Dauntless Mfg. Co.* v. *Davis,* 22 S. C. 584; *Cunningham* v. *Smithon,* 12 Leigh, 32.)

The findings are within the issues of the case, and no exception to the want of findings was filed in court within five days after the making of the finding or decision. (Comp. Laws, 3858.)

The appellate court will not disturb a verdict or judgment where there is a substantial conflict of the evidence, or where it is supported by material evidence. (*Tonopah L. Co.* v. *Riley,* 30 Nev. 322; *Wiggins* v. *Predere,* 105 Pac. 1024; *Murray* v. *Osborne,* 111 Pac. 31; *Rawhide B. F. M. Co.* v. *Rawhide C. M. Co.,* 111 Pac. 30; Cent. Dig., Appeal and Error, secs. 3983–3989; 2 Dec. Dig., sec. 1011.)

That the defendants sued were not the only guilty parties, was no reason for the refusal to enjoin those before the court. (*Sammons* v. *Gloversville,* 70 N. Y. S. 284; *Parker* v. *Woolen Co.,* 195 Mass. 591, 81 N. E. 468, 10 L. R. A. n. s. 584; *Corey* v. *Havener,* 182 Mass. 250, 65 N. E. 69; *Chipman* v. *Palmer,* 77 N. Y. 51, 33 Am. Rep. 419; *People* v. *Gold Run D. Co.,* 66 Cal. 138, 4 Pac. 1152; *Oulihan* v. *Butler,* 189 Mass. 288, 75 N. E. 726.)

A judgment rendered against several codefendants, though invalid for want of jurisdiction over them, is not void and cannot be impeached collaterally by defendants as to whom the court had jurisdiction. (*Jasper* v. *Mickey,* 4 S. W. 424; *Holton* v. *Lowner,* 81 Mo. 360; *Bailey* v. *McGinnis,* 57 Mo. 362.)

*Samuel W. Belford,* as *Amicus Curiæ:*

Where public improvements or works have been authorized by law and do not encroach directly upon private property, they cannot be treated and proceeded against as nuisances, nor will their existence be a good ground for recovery of damages as for a nuisance, except upon allegation and proof of negligence in their construction or operation. Where the alleged nuisance is the result of the development by the owner of his own land in the

production and utilization of its natural resources, the charge can be sustained only when it is shown that the owner has failed to exercise due care to so conduct his business as to avoid the injurious results complained of. (*Brown* v. *Humphrey*, 109 N. W. 714-717; *Hauck* v. *Pipe Line Co.*, 26 Atl. 644; *Vogt* v. *City*, 110 N. W. 603.)

The general rule governing the issuance of injunctions is applicable to private nuisances, and they will not be enjoined where there is a remedy of compensation for injuries. (*Randall* v. *Freed*, 97 Pac. 669; Wood on Nuisances, 3d ed. p. 1150; *Zimmerman* v. *Gretzmacher*, 98 Pac. 875.)

What the legislature declares to be lawful cannot be a nuisance unless through negligence and want of care. (*Randall* v. *Jacksonville St. Ry. Co.*, 19 Fed. 409; *State* v. *L. & N. Ry. Co.*, 86 Ind. 114; *Chope* v. *Detroit Co.*, 37 Mich. 195; *Gray* v. *Patterson*, 60 N. J. Eq. 385; *Crofford* v. *Alabama Ry. Co.*, 48 South. 366; *Southern Ry. Co.* v. *Albes*, 45 South. 234-238; *Simonds* v. *Telephone Co.*, 72 Atl. 175; *Farrell* v. *Old Town*, 69 Me. 72; *Winship* v. *Enfeld*, 42 N. H. 197; *Thompson* v. *Dodge*, 60 N. W. 545; *Steiner* v. *Phila. Tract Co.*, 19 Atl. 491; *A. T. & S. F. R. R. Co.* v. *Armstrong*, 80 Pac. 978; *Meyer* v. *V. & T. Ry. Co.*, 16 Nev. 341; *Longabaugh* v. *V. & T. Ry. Co.*, 9 Nev. 271; *Walsh* v. *V. & T. Ry. Co.*, 8 Nev. 110; *Trans. Co.* v. *Chicago*, 99 U. S. 635.)

By the Court, COLEMAN, J.:

This is a suit instituted by respondent against appellants to recover judgment for alleged damages in the sum of $48,450, and to obtain a decree of the court abating a certain dam in Walker River, known as the Spragg, Alcorn & Bewley dam, which, it is claimed, is responsible for the overflow of the Walker River, and the consequent damages. From a judgment in favor of plaintiff in the sum of $25,475 damages and a decree directing defendants to reduce the height of the dam, and from an order denying the motion for a new trial, this appeal is taken.

The plaintiff was, at the time the suit was instituted, and for a number of years theretofore, the owner of a ranch of 940 acres, through which the Walker River flows for a distance of over two and a half miles. Defendants own ranches on the river below the ranch of plaintiff. Between the years 1871 and 1873, one Mason, the then owner of the land upon which the dam is situated, and which is now owned by the plaintiff, erected, in conjunction with others, at and upon the extreme lower end of what is now plaintiff's ranch, the Spragg, Alcorn & Bewley dam, for the purpose of diverting the water from the river into a ditch for irrigation purposes. Almost a mile above the Spragg, Alcorn & Bewley dam there was erected in 1873 a dam known as the Merritt dam, to be used for the same purpose, which, though washed out in 1883, was rebuilt. Some distance above the Merritt dam, possibly from one-third to one-half mile, is the Perazzo ditch, which takes water from the river, and which, with the consent of plaintiff, was constructed in 1903. There are several other ditches, either on or just above the McLeod ranch, which take water from the river for irrigation. It also appears that the river, as it flowed through the ranch of plaintiff, was very crooked, and the plaintiff made several cuts for the purpose of straightening it. These cuts were through sandy soil, and, as a rule, were only about two feet wide; it being left to the river to wash out so much more of the soil as was necessary to carry the waters of the stream. The upper point of overflow, which is alleged to have caused considerable damage, was over two miles up the river from the Spragg, Alcorn & Bewley dam. The fall in the river is about 1 foot to the 1,000, which would make the bed of the river at the Spragg, Alcorn & Bewley dam about ten and one-half feet lower than at the upper point of overflow. Overflows from the river and upon plaintiff's land took place in the years 1862, 1868, 1876, 1881, 1884, 1886, 1890, 1902, 1903, 1904, 1905, 1906, and 1907. This suit is to recover for the damage alleged to have been caused by

the overflows in the years 1904, 1905, 1906, and 1907. It is urged by the appellants that the case should be reversed for the reason that it appears from the evidence that it was physically impossible for the Spragg, Alcorn & Bewley dam to have so affected the flow of the stream as to have caused the deposit of the silt, which was carried in suspension in the stream, as far up the river as the points of overflow. It is their theory that the dam would not affect the current of the river for a much greater distance than at the point where a horizontal line drawn from the crest of the water at the dam intersects the bed of the river. In other words, it is contended that, since the river has a fall of 1 foot to the 1,000, a dam one foot high would affect the flow of the river only for a little more than 1,000 feet up the river from the dam, a dam two feet high would affect the flow only a little over 2,000 feet up the river from the dam, and so on; and since the Spragg, Alcorn & Bewley dam, prior to 1903, was never more than four feet high, and at no subsequent time over five feet high, the flow of the stream could by no possibility be influenced above the Merritt dam. This theory not only appeals to the mind of the layman, but the appellants called several engineers, all of whom testified that the deposit of silt could not be affected to any appreciable distance above the point of intersection mentioned.

Prof. Thurtell, formerly of the University of Nevada, and some time state engineer, and now chairman of the Fourth Section Board under the Interstate Commerce Commission, after making a survey of the stream, testified that the deposit of silt would not be affected more than 200 feet above said point of intersection.

Mr. Hammond, the expert called in behalf of plaintiff, testified:

"Q. Now, then, assuming that the Spragg, Alcorn & Bewley dam is six feet in height, I am speaking now of the original bed of the river, where would that line, if drawn up the river, meet the original bed of the river? A. Six feet?

"Q. Six feet in height? A. Six feet in height. Six thousand feet. *   *   *

"Q. Assuming that the dam was seven feet in height, how high up would it strike the bed of the river? A. Seven thousand feet, theoretically.

"Q. If the dam was seven and a half feet in height, how high up would it strike the bed of the river? A. Seven thousand five hundred feet."

In opposition to the testimony of defendant's engineers, and the testimony of Mr. Hammond, just quoted, is the testimony of several ranchers who had lived in the community for a number of years. Witness Rallins testified, over the objection and exception of defendants:

"Q. Do you know how the water of the river came to overflow on those places along the ranch as you describe it? A. I do.

"Q. What was the cause of the overflow on the McLeod place? A. By building up the dam, causing sand and sediment in the river, and causing the river to overflow its banks.

"Q. What dam do you refer to? A. The Spragg, Alcorn & Bewley dam."

The witness Martin testified, over the objection and exception of defendants:

"Q. What was the cause of the damage to the land? A. Well, the cause was, the river bed was full of sand, and the water had to flow out some place.

"Q. Do you know the cause of the filling of the river with sand? A. Yes.

"Q. Now, what was the cause? A. Well, from my experience on the river, I know that dams cause the sand to form in the river.

"Q. Now, as to the place, the particular place known as the McLeod place, what particular dam do you have reference to as having caused the deposit of sand? A. I have reference to the Spragg, Alcorn & Bewley dam."

The witness Nichol testified, over the objection and exception of defendants:

"Q. Do you know what caused the deposit of sand in

the channel of the river above the Spragg, Alcorn & Bewley dam? A. Yes.

"Q. What was the cause of the deposit of sand in the channel of the river above the dam, and up as far as the ford at the McLeod house? A. The dam, the Spragg, Alcorn & Bewley dam.

"Q. Do you know what caused the overflow. A. The river not having the capacity to carry the water.

"Q. Why didn't it have the capacity? A. The river filled up with sand.

Plaintiff testified, over objection and exception:

"A. Yes, I testified very fully in regard to the cause, I think.

"Q. You may state what caused that, if you know of your own knowledge. A. I could give you here a statement as my positive opinion.

"Q. Well, I don't want any opinion, I want to know what you know. A. Well, I had better not say, I might not know, but I do know that it was caused by this dam in the river, I am positive; I know that it was."

Other witnesses testified to the same effect. It is this line of testimony which counsel for respondent, notwithstanding the admitted facts that the water which overflowed just above the Perazzo ditch went back into the main stream below the Merritt dam and above the Spragg, Alcorn & Bewley dam, and that there was no overflow between the Merritt and the Spragg, Alcorn & Bewley dams, think should be sufficient to establish their case by a preponderence of the evidence.

1. Counsel for plaintiff call our attention to the case of *Hand* v. *Catawba Power Co.,* 90 S. C. 267, 73 S. E. 187, in support of their contention that testimony of the ranchers in the neighborhood of the McLeod ranch should outweigh the testimony of the experts called by defendants. While it is undoubtedly the general rule that witnesses must testify as to matters of fact, and leave the conclusion to be drawn by the jury, there are certain exceptions to this rule; and, when it is impossible for the witness to detail all of the pertinent facts

in such a manner as to enable the jury to form a conclusion, the witness may give his opinion. The facts in that case no doubt justified the ruling of the court.

"It is not proper to allow one who is not an expert to express an opinion in any case upon a question with relation to which all the facts may be placed before the jury; and to receive as evidence the opinion of a lay witness upon the precise issue submitted for trial in such case would permit the witness to usurp the province of the court or jury trying the cause." (*Amer. T. & T. Co.* v. *Green,* 164 Ind. 349, 73 N. E. 707.)

See, also, *Loshbaugh* v. *Birdsell,* 90 Ind. 466; *Com.* v. *Sturtivant,* 117 Mass. 122, 19 Am. Rep. 401; *Balto. etc. Road* v. *Leonhardt,* 66 Md. 70, 5 Atl. 346; *Mann* v. *State,* 23 Fla. 610, 3 South. 207; *Stephenson* v. *State,* 110 Ind. 358, 11 N. E. 360, 59 Am. Rep. 216; *Shaw* v. *Jones,* 133 Ga. 446, 66 S. E. 240.

2. The question, then, is: Were the facts and circumstances which entered into the forming of an opinion by the witnesses themselves as to what caused the overflows complained of capable of being detailed to the jury? If they were, the opinion of the various nonexpert witnesses should have been excluded; if they were not, their admission and testimony by the court was not error. It appears from the evidence in this case, which took about five weeks to hear, that various witnesses detailed what transpired along the river as it flows through the property owned by the parties, from a very early day in the history of the valley. The various dams, ditches, cuts, overflows, etc., were minutely detailed to the jury. Besides, the jury were taken to, and personally viewed, the premises in question. Under the condition of the record, it appears to us that the objections to the opinions of the nonexpert witnesses should have been sustained.

In this connection, there is another fact worthy of consideration, and that is the relationship of the Merritt dam to the Spragg, Alcorn & Bewley dam, so far as the latter affected the deposit of silt above the Merritt

dam. It must be borne in mind that the Merritt dam is nearly a mile further up the river from the Spragg, Alcorn & Bewley dam, and that it was put in for the purpose of diverting a portion of the water of the river into an irrigation ditch. The Merritt dam was partly washed out in 1883, but was rebuilt, and, so far as appears, remained in the river and was eventually covered with sand; the last seen of it, according to the testimony of plaintiff, being in 1904, while Waldo, one of his witnesses, testified that he saw it in 1906.

J. C. Mills, a witness for plaintiff, and an owner in the Merritt ditch since 1886, testified that when he first saw the ditch the bed of the river was from a foot to a foot and a half below the level of the ditch, and that it was for this reason the dam was put in; that in 1886 the dam was on a level with the floor of the gates; that about that time the dam was practically covered with sand and has remained covered ever since; that the sand kept increasing after 1886 until in 1900, when he assisted in putting in another headgate in the Merritt ditch; that in 1900 the bed of the river was three feet and one inch higher than it was in 1886; that in the fall of 1905 the river was filled with sand at the Merritt dam level across and only eighteen inches or less from the top of the banks; and that at the time of the trial there were three feet of sand on top of the rocks of the Merritt dam.

G. T. Feiganspan, a witness for the plaintiff, and an owner in the Merritt ditch, and its manager since 1880, testified that he first saw the Spragg, Alcorn & Bewley dam in 1890; that five or six years after 1883, he noticed that the Merritt dam was no longer in sight; that in his opinion the Spragg dam backed sand over the Merritt dam in 1885. Asked why he would say the Spragg dam covered the Merritt dam with sand in 1885, when he did not see the former dam until five years later, he replied, "That is the only thing I can lay it to."

Plaintiff testified that the Merritt dam raised the water two feet.

Now, is it not conclusive that the Merritt dam, under respondent's theory of the case contributed to the filling of the river? The rebuilding of the Merritt dam in 1883 is a conclusive argument to the effect that at that time at least the backwater from the Spragg, Alcorn & Bewley dam did not reach up to that point, for, if it had, the effect of the backwater would have accomplished the very purpose for which the dam was rebuilt. Furthermore, if the Merritt dam was two feet high, and the fall of the river being 1 foot to the 1,000, and if the Spragg, Alcorn & Bewley dam was 4,000 feet further down the river from the Merritt dam, was it not a physical impossibility for the backwater to have reached the top of the Merritt dam unless the Spragg, Alcorn & Bewley dam was six feet high? Upon the same theory, if the Merritt dam was only one foot high, and the Spragg, Alcorn & Bewley dam 4,000 feet further downstream, it must have been five feet high to have caused the backwater from it to reach the top of the Merritt dam; and if the Merritt dam was six inches high, and the Spragg, Alcorn & Bewley dam 4,000 feet further down stream, it must have been four and a half feet high before the backwater from it could have become as high as the Merritt dam. If this is true, how could it be possible for the backwater from the Spragg, Alcorn & Bewley dam to affect the stream above the Merritt dam? In fact, counsel for respondent say in their brief:

"It is true that McCray, Thurtell, and Hammond testified a dam could not cause the deposit of sand above the point where the dam affected the current of the river. That is the statement of a proposition known to every one, which statement is a mere hypocrisy intended and calculated to mislead the jury and the court. The issue was as to how far the dam did affect the current of the river."

Counsel for respondent take the position that the contention of appellants is correct to the extent that backwater will not be affected much further up the stream than at the point where a horizontal line drawn

from the crest of the water as it passes over a dam intersects the bed of the river, but contend that a different rule applies so far as the influence upon the deposit of sand is concerned. If we concede this contention to be correct as to the influence on the deposit of sand, we are yet unable to see how the backwater from a dam can possibly affect the deposit of sand above a dam which is further up the stream, when the backwater from the lower dam does not reach the top of the upper dam. If we take the correct view of the situation, it necessarily follows that the opinions of the nonexpert witnesses called by plaintiff, even if admissible, are of little or no value whatever. It is said:

"Courts are not so deaf to the voice of nature, or so blind to the laws of physics, that every utterance of a witness in derogation of those laws will be treated as testimony of probative value simply because of its utterance." (1 Moore on Facts, sec. 160.)

Mr. Justice Marshall, in speaking for the Supreme Court of Wisconsin, in *Groth* v. *Thomann,* 110 Wis. at page 181, used the following language:

"When physical situations or matters of common knowledge point so certainly to the truth as to leave no room for a contrary determination, based on reason and common sense, such physical situation and reasonable probabilities are not affected by sworn testimony which, in mere words, conflicts therewith. The fact established by the situation itself and matters of common knowledge, so clearly that no one can reasonably dispute it notwithstanding evidence to the contrary, must stand uncontroverted and uncontrovertible, condemning as false such contrary evidence, either upon the ground of mistake or something worse."

Just here it may not be out of place to say that, while Prof. Merriman, in his Treatise on Hydraulics (9th Ed.), at page 353, takes the position that while many attempts have been made to determine the precise distance that a dam will cause backwater, none can be said to have been successful. From the formulas which he gives we

understand him to mean that because of the varying
dimensions, fall, etc., of a stream, it is difficult to tell
the exact point at which the backwater from a dam will
affect the flow of a stream. We think there can be
no doubt about that proposition; but the matter of a few
hundred feet, more or less, makes no difference in this
case. The question of approximating the distance with
some considerable degree of exactness arises in cases
where a dam causing backwater may affect a mill wheel
located on the stream above the dam. It is clear, how-
ever from Mr. Merriman's work, that the point of
backwater never varies greatly from the point where
a horizontal line drawn from the crest of the dam will
intersect the surface of the stream. But regardless of
Prof. Merriman's view, it appears from the statement
in the brief of counsel for respondent, and from the evi-
dence of his expert, Mr. Hammond, that there is no
substantial difference of opinion between the parties to
the suit as to the distance at which the flow of water
will be affected by a dam.

Taking respondent's view of the case, however, it is
impossible to comprehend that the Merritt dam was
not having the same effect in causing deposits of sand
in the bed of the river above that dam that the Spragg
dam was causing above it. Under counsel for respon-
dent's theory, the Merritt dam must have been caus-
ing a deposit of sand in the bed of the river above that
dam for about fourteen years before the Spragg dam
could possibly have had any effect upon the river above
the Merritt ditch. According to respondent's theory, a
deposit of sand is caused in the stream at the upper point
of backwater, thus raising the bed of the river—in effect
causing another damming at that point—which in turn
checks the current still further up the stream, and this
process continues indefinitely up the stream. If this
theory is correct, a dam in a river carrying silt, when it
once starts a deposit of silt, must operate as a continu-
ing cause of deposit up the stream, except as such
deposit may be overcome by scouring during certain

stages of the river volume. Hence it follows that it is impossible, under respondent's theory, to say that the Merritt dam was not a contributing cause to respondent's injury. A fact that should be borne in mind in considering respondent's theory is that the height of a dam is immaterial so long as it is high enough to cause backwater.

Assuming the theory of respondent to be correct, and assuming that the Spragg dam did cause the river between it and the Merritt dam to fill with sand so that eventually the sand reached to the top of the Merritt dam, it then is a physical fact that the two dams would thereafter cooperate in causing a deposit of sand in the river above the Merritt dam.

It is to be regretted that the laws of hydraulics controlling the deposit of material carried in suspension in flowing streams have not been demonstrated so far as to establish as a known law whether backwater from a dam will or will not cause a deposit above the point of backwater.

**3.** This is the first case where a dam used to divert water for purposes of irrigation has been charged with responsibility for an overflow alleged to have been occasioned by filling the bed of the stream with a deposit of sand far above the point reached by backwater caused by the dam. If scientists had determined these laws so that they could be applied to the facts of this case, courts would be bound to apply them. In so far as experts upon hydraulics have expressed their opinion, both in this case and in the *Hand* v. *Catawba Power Co.* case, cited *supra*, such opinion has been that the dam would not affect the deposit of sand and silt much above the point of backwater. Where, because they are unknown, it is impossible to apply fixed natural laws to a solution of the problem, courts must resort to the best means available of determining, if possible, the truth of the case. Hence expert testimony may be considered, as well as facts established by the testimony of other witnesses; but, as before pointed out, nonexpert witnesses may not be

permitted to invade the province of the jury and testify directly to the ultimate fact in the case.

In considering the question of what caused the overflow for which recovery is sought, and assuming the correctness of respondent's theory, there are, in our opinion, other elements to be reckoned with besides the Spragg, Alcorn & Bewley dam. We believe no one will deny that the rapidity with which water flows has a good deal to do with the percentage of deposit of the silt which is carried in the water. If sufficient sand is deposited into running water to raise the percentage of sand from 5 per cent to 50 per cent, it can readily be seen that the speed of the flow will be greatly decreased. The plaintiff made several cuts through his ranch for the purpose of straightening the river. The method of making a majority of these cuts was to dig a ditch about two or three feet wide and turn the water of the river into the ditch that it might, in the ordinary process of erosion, wash out a channel wide enough to carry all the waters of the stream. One of the cuts was made by taking off the surface to a depth of two feet and thirty feet wide. The contents of all of the cuts, which washed down the river, were over 30,000 cubic yards. The last-named cut was made in April, 1907, and the water turned in before the overflow of that year, though it is not known to exactly what depth the cut was washed out at the time of the overflow. The cutting away of the soil by the water flowing through these new cuts necessarily had the effect of greatly increasing the sand which was carried in the water; and, consequently, in decreasing the rapidity of the flow of the stream, naturally increasing the quantity of the deposit of silt in the river below the cut. Believing, as we do, that the cuts made by the plaintiff contributed toward the filling up of the river, we are unable to see why defendant should be held liable for the total damage done to plaintiff's ranch caused by the overflows, if to any extent whatever.

It is contended by counsel for respondent that the sand washed into the river from the several cuts made by the

respondent cannot be regarded as a contributing cause to the filling of the bed of the river, for the reason that an equal or greater amount of sand and silt was deposited in the old channel after the new channel was established by the cuts. In the absence of other proof, which does not appear in this case, it would not follow as a necessary conclusion of fact that these cuts, by reason of the filling up of the old channel due to a decrease in the rapidity of the current therein, had not caused a greater deposit in the bed of the river below the cuts than would have been the case if the cuts had not been made. That would depend largely upon the character of sand and silt deposited in the old channel. A fine silt, which the normal flow of the river would carry off, leaving little or no deposit in its bed, carried from time to time into the old channel, would there be deposited owing to the sluggish current being unable to hold it in suspension, and would eventually fill the old channel. The mere fact that an equal or greater cubic content of sand and silt was deposited in the abandoned channel, without other proof, would be of little weight, in view of the fact that known laws of hydraulics determine that a stream's carrying capacity of sand, silt, or other material has a fixed ratio to the velocity of the current.

In addition to the silt from the cuts mentioned, there must have been other causes contributing to the filling of the river. It is a well-known law of hydraulics that the more the volume of water in a stream is decreased the slower it flows, and consequently the greater is the increase in sedimentary deposit. There were on, or just above, the ranch of plaintiff, during at least a portion of the time when it is claimed the backwater from the Spragg, Alcorn & Bewley dam caused the deposit of silt to which the overflows are attributed, at least five ditches which took water from the river, thereby decreasing the flow of the water in the river, and correspondingly increasing the deposit of silt. The last one of the ditches to be constructed was the Perazzo ditch, in 1903, upon plaintiff's land, and with his consent. As we view the case, each

of the ditches alluded to contributed its share to the filling up of the river.

**4.** It is the contention of appellants that, under such circumstances, they are liable only to the extent to which they contributed to the injury to plaintiff's ranch. We think their contention as to the law is correct. In the case of *Blaisdell* v. *Stephens*, 14 Nev. on page 21, 33 Am. Rep. 523, Mr. Justice Hawley, in delivering the opinion of the court, the case being similar to the one at bar, said:

"The general principle is well settled that where two or more parties act, each for himself, in producing a result injurious to plaintiff, they cannot be held jointly liable for the acts of each other."

This view is sustained by ample authority: Gould on Waters, sec. 222; *Miller* v. *Highland D. Co.*, 87 Cal. 430, 25 Pac. 550, 22 Am. St. Rep. 254; *Gallagher* v. *Kemmerer*, 144 Pa. 509, 22 Atl. 970, 27 Am. St. Rep. 673; *Chipman* v. *Palmer*, 77 N. Y. 51, 33 Am. Rep. 566; *Watson* v. *Colusa*, 31 Mont. 513, 79 Pac. 15; *Woodland* v. *Portneuf*, 26 Idaho, 289, 146 Pac. 1106; *South Bend M. Co.* v. *Lyshart*, 12 Ind. App. 185, 39 N. E. 908; *Harley* v. *Merrill B. Co.*, 83 Iowa, 73, 48 N. W. 1000; *Swain* v. *Tenn. Copper Co.*, 111 Tenn. 430, 78 S. W. 93; *Sloggy* v. *Dilworth*, 38 Minn. 179, 36 N. W. 451, 8 Am. Rep. 656; *Draper* v. *Brown*, 115 Wis. 361, 91 N. W. 1001.

**5.** Error is assigned to the overruling of an objection by the defendants to the following questions propounded to the plaintiff:

"Q. Who, if any one, warned you of the building of the dam (referring to the S., A. & B. dam), and the effects of the raising of the dam? A. One in particular was Mr. N. H. A. Mason. He is dead now. He was an owner in the Spragg, Bewley, Alcorn.

"Q. What did he say about it? A. He was speaking about that dam. He had men, or his foreman, and so on, had helped build the dam there for a number of times, and Mr. Mason says to me, 'if they keep building that dam up, some day it is going to ruin your place,' and it

was about the time, or very near the time, that I gave Mr. Mason a deed of one-half of my water right. I think it was in 1889, somewhere along there."

At most, this testimony did not purport to be more than the giving of evidence of a statement made by one of what might or would happen at some time in the future, as distinguished from a statement as to an existing fact. It was a mere prophecy. We are unable to call to mind any rule, or conceive of any reason, which would justify the court in receiving such testimony. (*Burt* v. *Wigglesworth*, 117 Mass. 306.) It is contended on the part of respondent that this testimony is proper because Mason owned the Miller & Lux ranch at the time it is alleged he made the statement. Conceding that the theory advanced as to the law is correct, we find no evidence in the record to sustain it.

6. On the trial defendant objected to certain questions going to establish the extent of plaintiff's damage. The witness William Rallens was asked:

"Q. In examining the ranch, did you form any opinion as to the extent of the damage caused to the land by the overflow? A. I did.

"Q. What in your judgment, then, from your examination, do you consider the land overflowed was damaged? A. I consider two-thirds of its value."

We think the objection should have been sustained. If the witness was qualified, he might have testified as to the value of the land before and after the overflow. Such would have been the proper method of arriving at the damage. (*Howell* v. *Medler*, 41 Mich. 641, 2 N. W. 911; *Upcher* v. *Overlender*, 50 Kan. 315, 31 Pac. 1080; *International R. Co.* v. *Fickey*, 125 S. W. 327; *Louisville R. Co.* v. *Sparks*, 12 Ind. App. 410, 40 N. E. 546; *Van Deusen* v. *Young*, 29 N. Y. 20; *Tenn. Co.* v. *McMillan*, 161 Ala. 130, 49 South. 880; *Central Ry. Co.* v. *Barnett*, 151 Ala. 407, 44 South. 392.)

7, 8. Prior to the trial of the case, the deposition of plaintiff was taken, on the motion of defendants. Upon the trial defendants objected to certain questions asked

the plaintiff on cross-examination by his attorneys at the taking of the deposition.   One of the questions was:

"Q.  Take for five years before the floods, Mr. McLeod, how much, on an average, did you clear off of this entire ranch?"

There were several just such questions to which objections were made and overruled.   It is the contention of defendants that, notwithstanding the fact that the deposition was taken at their instance, plaintiff having offered the deposition in evidence, he made it his evidence, and that, if their objections are meritorious under the accepted rules of evidence, they ought to have been sustained. Section 3505, Cutting's Compiled Laws, provides:

"When a deposition has once been taken, it may be read in any stage of the same action or proceeding by either party, and shall then be deemed the evidence of the party reading it."

In section 3504, Cutting's Compiled Laws, it is provided: "*   *   *   And thereupon such deposition may be used by either party upon the trial or other proceeding against any party giving or receiving the notice, subject to all legal exceptions."

It would appear that the statute has pretty clearly declared the rights of the respective parties in such matters, the statute itself providing that the evidence shall be subject to all legal exceptions.   Section 3504 also provides: "*   *   *   But if the parties attend at the examination, no objections to the form of the interrogatory shall be made at the trial, unless the same was stated at the time of the examination."

This seems to leave no room for doubt as to the meaning of the exception quoted above.   The logic of the situation is that the court could rule upon the legal sufficiency of the matter involved upon the trial, while an objection to the form of the question should be pointed out at the time of the taking of the deposition, that it may be corrected at that time if the objection is deemed serious by the opposing party.   It was said in *Hatch* v. *Brown*, 63 Me. 410:

" When a party uses a deposition taken by his opponent, but not offered in evidence by him, he makes it his own, and his opponent has the same right of objection to the interrogatories and answers which he would have had if the deposition had been taken by the party offering it; and he is not precluded by the fact that the interrogatories objected to were propounded by himself when the deposition was taken."

See, also, *In Re Smith*, 34 Minn. 436, 26 N. W. 234; 6 Ency. Pl. & Pr. p. 585.)

We can conceive of no theory upon which such testimony would be proper as a basis for the fixing by the jury of plaintiff's damages. The objection should have been sustained.

Counsel for appellant, and counsel appearing *amicus curiæ*, have urged very forcibly that this court ought to hold that, in the absence of negligence, there could be no liability in damages in this case, even assuming that a dam could cause a deposit of sand in the bed of a river above the highest point of backwater, for the reason that dams in river channels are essential to irrigation in this state; that the law recognizes irrigation not only as lawful but as specially favored in the law; and that damage, caused otherwise than by direct overflow, incapable of being foreseen or guarded against, is such a consequential damage that no liability in the law exists therefor. Many authorities, applicable to public or *quasi*-public utilities, are cited in support of this contention. We have no hesitancy in saying that this rule ought to be held applicable in cases of irrigation dams, but we are not prepared to say that it should be applied to every sort of irrigation dam that might be constructed. In a stream carrying large quantities of sand and silt during portions of the year, it might be regarded as negligence to maintain a solid dam, while the maintenance of a dam with movable gates, by which the flow of the river and the deposit of silt could be regulated, could not be held to be negligence, and no liability for damage could be

chargeable thereto, otherwise than an overflow due directly to backwater.

While there are various other errors assigned, we deem it unnecessary to consider them.

It is ordered that the order and judgment appealed from be reversed, and that the case be remanded.

NORCROSS, C. J., concurring:

I concur in the judgment and in the opinion of Mr. Justice COLEMAN. The case is of such unusual character that I venture to add some additional supplementary observations. Whether defendants were liable to respond in damages for the injury done to plaintiff's property caused by the Walker River overflowing its banks during the years 1904 to 1907, inclusive, has presented for determination intricate questions, both of law and fact, which the court, notwithstanding the aid of elaborate briefs of respective counsel, has found no little difficulty in determining. If the contention of counsel for appellants—that the injury, even if occasioned in the way claimed by respondent, was remote and consequential and for which no remedy in law was afforded—could have been sustained, the necessity for considering other questions would have been eliminated.

It is conceded in this case that the overflows which occasioned the damage were not caused by backwater from the dam. If the dam complained of had raised the water in the river to the top of the banks at the dam, the water level would be 11.42 feet below the bank at the highest point of overflow. The banks of the river at other points of overflow varied from about 4½ to 8 feet higher than the banks of the river at appellants' dam. Respondent's theory rests upon the contention that the current of the river will be affected above the level of backwater by reason of the deposit of sand and silt due to a checking of the velocity of the current within that portion of the river affected by backwater. It is here we have the conflicting views as to whether this can or cannot

happen in accordance with natural laws. It is conceded that sand and silt carried in suspension in a stream will not be deposited in the channel unless the velocity of the stream is checked to such an extent that it has not the necessary carrying power to longer hold it in suspension. It is a known law of hydraulics that all portions of a cross-section of a stream have not the same velocity, and this variation in velocity causes some deposit of sand and silt upon the bed of the stream. Plaintiff's whole case rests upon an application of the known law of hydraulics that a reduction in the velocity of a stream carrying sand or silt in suspension will cause such sand or silt to be deposited on the bed of the channel.

Whether this law of hydraulics is applicable to the facts of this case—that is, whether appellants' dam can have the effect of decreasing the velocity above the level of backwater—is the question upon which plaintiff's counsel and witnesses differ in opinion from the opinions of the expert witnesses upon hydraulics. The point I wish to emphasize here, however, is simply that an established law of hydraulics is invoked to prove that the appellants' dam is the sole cause of plaintiff's injury, when from the undisputed facts in the case it is impossible that it could have been the sole cause of the filling of the river channel by a deposit of sand and silt, for the reason that other agencies under known laws of hydraulics contributed to a greater or less degree in checking the velocity of the current. The volume of water naturally flowing in the river was reduced by the numerous ditches diverting water from the river upon or above the ranch of plaintiff and above defendants' dam. Necessarily these ditches reduced the volume of water in the river below, and hence necessarily reduced the velocity of the current. It has been contended, for example, that appellants' dam was the sole cause of the filling of the river above that dam, and below the Merritt dam, and that the Merritt dam could not have had any effect in filling the river below the latter dam. The Spragg,

Alcorn & Bewley dam caused a deposit of sand and silt between the two dams, because it decreased the grade of the river to a level for the distance it caused backwater; the reduction in grade causing a reduction in velocity. The Merritt ditch caused a reduction in the volume of water flowing below the Merritt dam, and this reduction in volume caused a corresponding reduction in the velocity of the current. It certainly is immaterial whether velocity is reduced by a cause which affects the grade or a cause which affects the volume—both contribute to the deposit of sand and silt.

An application of these established laws of nature to the facts of this case illustrate the reason why the opinion of nonexpert witnesses upon the ultimate fact in the case ought not to be permitted. Courts are bound to apply known natural laws so far as they are applicable. A lack of knowledge of known natural laws may cause a witness to form an entirely erroneous opinion as to the cause of a certain effect. The witnesses in this case who testified that the Spragg, Alcorn & Bewley dam was the cause of the overflow were undoubtedly perfectly convinced of the correctness of their opinion and honest in its expression, but the physical facts and known laws of hydraulics are conclusive that those opinions were in part, at least, erroneous.

The long delay in the determination of this case is regretted extremely. Changes in the personnel of the court making necessary a reargument and reassignment of the case, the voluminous record, number, newness, and importance of the questions presented, and an endeavor to harmonize conflicting views, account for a delay in the decison which has been seemingly unreasonable.

McCARRAN, J., dissenting:

I dissent.

This case was originally assigned to the writer for the preparation of the opinion of the court. In view of the position taken by the majority of the court, I am herewith

setting forth only so much of my opinion originally prepared as I deem applicable to the matters touched upon in the prevailing opinion.

The prevailing opinion in this case rests primarily upon the contention of appellants that it was a physical impossibility for the Spragg, Alcorn & Bewley dam to cause the overflow in question. The principal ground asserted in support of this declaration is the fact that a horizontal line drawn from the crest of the dam would intersect the river bed at a point far below the place where the flood waters broke from the river channel and flowed over the premises of McLeod. However true it may be that the current of a stream will not be affected by an obstruction above a point where a horizontal line passing over the crest of the obstruction would strike the bed of the stream, this rule cannot be strictly applied, and, in fact, will not apply at all, where the stream, as in the case at bar, is one which during certain seasons of the year carries great quantities of silt and sand in its current.

Evidence was introduced in this case of levels taken from the dam up the Walker River, for the purpose of showing that the waters of the Walker River were not affected or raised as far up the river as the point of overflow. Testimony of engineers versed in the subject of hydraulics was introduced, tending to establish that the dam in question could not affect the river above the point where a horizontal line from the crest of the dam would intersect the bottom of the river. Testimony was introduced to show that this point of intersection was far below the premises of respondent affected by the overflow. On the other hand, testimony was introduced coming from witnesses who had spent many years in and about the vicinity of the property in question, and who had for many years past observed the action of the Walker River, and these witnesses, basing their statement on their observation and experience, testified not only that the bed of the river was filled with silt and sand and debris as a direct result of the dam in question, but that the overflowing of respondent's premises was

caused by the dam. In this respect, we find a direct conflict between the testimony of the experts offered on behalf of appellants based on scientific investigation and that of nonexperts based on actual observation and experience.

It is manifest that the jury, having heard both sides of the testimony, were convinced by the latter. Indeed, we believe, as has been well asserted by other courts, that, owing to the impossibility of arriving at precisely accurate results by the use of instruments, running over many miles in extent, involving, as in this case, a great number of stations and the adjustment, taking and registering of levels thereat, and the many different circumstances, explainable and unexplainable, which effect the action of water when obstructed and ponded in running streams, actual tests by observation and experience afforded the most satisfactory testimony upon which to rely in determining the results from such obstructions. (*Turner* v. *Hart,* 71 Mich. 128, 38 N. W. 890, 15 Am. St. Rep. 243; *Brown* v. *Bush,* 45 Pa. 61; *Decorah W. M. Co.* v. *Greer et al.,* 58 Iowa, 86, 12 N. W. 128.)

In the case of *Turner* v. *Hart, supra,* the Supreme Court of Michigan, in considering a similar subject, said:

"Every author treating upon the subject of hydrodynamics acknowledges and points out the difference between theoretical and actual tests, and, in advancing practical rules, modifies the theoretical to correspond as nearly as possible to actual observation and experience. We think the observation and experience of the witnesses introduced by complainants is controlling when brought in conflict with instrumental measurements, however accurately and carefully taken."

In the case of *Hand* v. *Catawba Power Co.,* 90 S. C. 267, 73 S. E. 187, the Supreme Court of South Carolina, in dwelling upon a subject analogous to the one at bar, said:

"According to the testimony of defendant's engineers, the fall in the creek from plaintiff's mill to the backwater from defendant's dam is about $23\frac{1}{2}$ feet, and they say that it is a physical impossibility for defendant's

dam to have caused plaintiff's injury. Notwithstanding, there was testimony which reasonably warranted a contrary opinion, and the jury took the contrary view, and found a verdict for the plaintiff, upon which judgment was duly entered."

The question of the effect of an obstruction on a running stream, and as to the distance upstream within which the flow may be affected, has been one much discussed by authorities on the subject of hydraulics. Where conditions are uniform and constant, where the grade is regular and the dimensions are fixed, the rule sought to be relied upon by appellants, by reason of which they claim it to have been a physical impossibility for their dam to have caused the flood, is one which for all practical purposes is invariable. But where conditions are such as those presented in the case at bar, wherein the effect of an obstruction thrown across a running stream is to be calculated, there is no rule, so far as we are able to ascertain from the authorities on this subject, that is invariable or can be definitely relied upon.

The record here, and especially that portion of it wherein the testimony of skilled engineers was produced on behalf of appellants, discloses constantly changing conditions in the Walker River. The measurements and calculations were taken by the establishment of stations at given distances above the dam, and at each station there was found to be change in velocity, change in depth, difference in slope, in width of stream bed, as well as differences in direction and force of the flow. It is by reason of these differences in the fundamental things essential for strict computation that the rule sought to be relied upon by appellants in this case fails, in my judgment, to be applicable.

Prof. Mansfield Merriman, of the department of civil engineering of Lehigh University, in his Treatise on Hydraulics, speaking on this subject, says:

"When a dam is built across a channel, the water surface is raised for a long distance upstream. This is a fruitful source of contention, and accordingly many

attempts have been made to discuss it theoretically in order to be able to compute the probable increase in depth at various distances back from a proposed dam. None of these can be said to have been successful, except for the simple case where the slope of the bed of the channel is constant and its cross-section such that the width may be regarded as uniform and the hydraulic radius be taken as equal to the depth." (Merriman on Hydraulics, 9th Ed. p. 353.)

This learned author, in discussing the subject of the applicability of the rule to streams of varying slope, width, depth, and velocity, emphasizes the impossibility of accuracy under such conditions, even where, as in the case at bar, the stream is divided into reaches, wherein the slope, width, depth, and velocity can be regarded as approximately constant; and in this respect he says:

"Even if this be done, the results of the computations must be regarded as liable to considerable uncertainty."

In the case at bar, a greater and even more complicated problem presents itself, in our attempt to enforce the rule sought to be relied upon by appellants. The application of the rule contemplates as a primary condition a minimum of solids in suspension. The record here, in so far as the testimony of many witnesses is concerned, and the photographs admitted in evidence, presents conditions which make the enforcement of the rule and its applicability even more uncertain and unreliable, if not impossible. The Walker River is a meandering stream, much given to cutting and washing, and hence to changing its course and bed. Its source and supply of water are from the snow banks on distant mountain ranges. The amount of water in its flow depends largely upon the supply of snow and its melting condition, the volume of the flow being usually greater during the spring months when the lower snow deposits melt and their waters find a common source in the Walker River. During this season, by reason of this increased volume and the new channels through which it passes to the river bed, and the natural erosive action of the river itself, there is carried in

suspension great quantities of silt, sand, and general debris. When this water, highly impregnated with soils, is obstructed, the creation of dead water upstream from the obstruction causes a deposit of the solids held in suspension, and this deposit takes place in the order of the specific gravity of the substances carried.

It is generally conceded by all authorities on the subject of hydraulics that the rule sought to be applied by appellants here is one which is attended with uncertainty, except under ideal conditions. The rule is not strictly applicable, except in case of a river or canal of practically uniform width and uniform slope in the direction of the flow.

Taking into consideration the testimony of the witnesses whose years of experience and opportunity for observation permitted them to testify as they did as to the cause of the overflow being the dam, the jury was warranted in finding, and had substantial evidence before it upon which to find, that, notwithstanding the testimony of the experts whose scientific investigation caused them to testify that it was a physical impossibility for the Spragg, Alcorn & Bewley dam to affect the flow of the Walker River to such a point upstream as would cause the overflowing of respondent's premises, the dam in question directly and indirectly brought about the overflow and injury to the premises of respondent. As I have already stated, the whole premises, the river, and the various dams and obstructions, were viewed by the court and jury, and this opportunity for observation afforded the jury, together with the testimony of the witnesses as to the cause of the overflow which inundated the premises of respondent, was sufficiently substantial to warrant us in applying the rule that though there may be some conflict in the evidence as to the agency which caused the flooding of respondent's premises, inasmuch as the general verdict of the jury was in effect that it was the obstruction maintained by appellants, the finding in this respect should not be disturbed.

In this connection it may be well to observe that, in view of the issues joined in this case, it can make no difference whether the flood which injured respondent was caused as the direct action of the dam maintained by appellants, or whether the same was caused by reason of the filling up of the channel of the river with sediment due to the action of appellants' dam. The sediment and sand deposited in the channel of the river may have been, and probably was, an intervening agency; yet if this intervening agency was established as the direct result of the act of appellants in enlarging and raising the dam, and if the action of the dam, in conjunction with the action of the sediment, filling up the channel of the river, caused the river to overflow and flood the premises of respondent, then, the dam of appellants being the first wrong done, the consequences, as well as every intermediate result, such as the filling of the channel of the stream with sand and sediment, or the creation of islands or bars or the changing of the current, are to be considered in law as the proximate result of the first wrongful cause.

It cannot be denied that there may be occasions where the rule of physical impossibility would be manifest, and in this respect our attention is directed to the case of *Lowery* v. *San Joaquin & Kings River Canal & Irrigation Co.*, 134 Cal. 185, 66 Pac. 225. Appellants, in their brief and oral argument, lay much stress upon the force and effect of this decision as being applicable to the case at bar, but there are vital distinguishing features. In the Lowery case, *supra*, the land inundated was low, and part of it was designated as swamp and overflow land. Before the erection of the dam in the San Joaquin River, it had been constantly subjected to overflow in wet seasons. In that case, it appears, there was a total absence of any direct evidence that defendants' dam caused the overflow complained of. That it was a physical impossibility for the dam complained of to have caused the overflow in that case was testified to by experts produced by

the defendant company, and was practically admitted by the expert offered on behalf of plaintiff. The court in its decision especially comments on the fact that plaintiff's expert not only admitted the insufficiency of his data, but nowhere testified that the dam did affect or could have affected the waters of Four Tree slough, the channel complained of.

There is another element in that case which distinguishes it from the case at bar. We find in the decision the statement:

"For more than five years prior to the flooding of plaintiff's land, the dam was continuously maintained at its present height."

Moreover, that case presented facts which established without conflict that plaintiff's land was constantly subject to overflow at high water. In my judgment, the case affords nothing that would assist us in the solution of the problem at bar.

Nor are we afforded any assistance by the case of *Hoffman* v. *Tuolumne County Water Co.*, 10 Cal. 413, referred to in appellants' brief.

It is the contention of appellants that inasmuch as they and their predecessors had the legal right to construct and maintain the ditch known as the Spragg, Alcorn & Bewley dam, and to erect and maintain the dam and divert the waters for the purpose of irrigation, they cannot be held liable in this case. They further contend that no direct trespass being alleged, and there being no allegation that the dam directly overflowed the land, they can be held liable only in case of negligence; they contend further that no negligence was established by the evidence, hence no liability attaches.

The general rule applicable to this phase of appellants' contention is that every man has a right to have the use of the flow of water in its natural channel in his own land. In using it, however, the owner must so divert the water and so apply it as to work no material injury or annoyance to his neighbor, either above or below him. It is the duty of a party erecting an obstruction in a natural

stream, especially where there are adjoining owners whose lands and premises might be subject to new conditions arising in the stream by reason of his obstruction, to notice not only the effect of his obstruction at the time of its erection, but its effect at all seasons of the year. Where it is a known fact that the flow and quantity of water in a stream vary with the seasons of the year—the spring bringing its freshets, and the fall bringing its scarcity of water—such condition should be expected and anticipated by one seeking to obstruct the flow. It has been held by eminent authority that it is the duty of one who attempts by means of a dam or obstruction to impound the flow of a stream to calculate the probable effects of the dam in the several seasons of the year on the property of his neighbor above, as well as below, his obstruction. "A neglect to use the necessary precaution," says the court in *Bell* v. *McClintock*, 9 Watts (Pa.) 119, 34 Am. Dec. 507, "or a miscalculation of its effects, where it works an injury to another, may be compensated in damages." And the court, in this respect, further lays down the rule:

"When, however, the injury arises from causes which might have been foreseen and avoided, as in the cases of ordinary periodical freshets, it is but right that he whose superstructure is the immediate cause of the mischief should bear the loss. In that case there is the concurrence of negligence with the act of Providence, which, as it is seen, is the criterion of liability."

To the same effect we find the cases of *McCoy* v. *Danley*, 20 Pac. 85, 57 Am. Dec. 680; *Talbot et al.* v. *Whipple*, 7 Gray (Mass.) 122.

In the case of *Hagge et al.* v. *Kansas City S. Ry. Co.* (C. C.) 104 Fed. 391, certain pilings used by the railway company in the construction of its bridge across a watercourse were, after the completion of the bridge, cut off and left at such height above low-water mark as to occasion an accumulation of debris which obstructed the natural current of the river and thereby caused the water to run over the natural bank onto adjoining lands. The act of

the railway company in so cutting off and leaving the pilings, with the consequent damages, was held to constitute negligence. In that case, the court, having the matter under consideration on demurrer, said:

"If the defendant is maintaining such nuisance, and this occasions the overflow of the water, flooding the complainants' land, and injuring the crops, it presents ground of action."

To the same effect is the case of *Brink* v. *Railway Co.*, 17 Mo. App. 177.

In the case of *Hardin* v. *Ledbetter*, 103 N. C. 90, 9 S. E. 641, it was held that where the owner of a mill-dam removed his obstruction, thereby causing the accumulation of mud and debris to pass downstream and fill up the mill-pond of another to such an extent as to back the water to the injury of the party who removed his obstruction, the latter could recover damages caused by the backwater.

To the same effect, we find the case of *Cowles* v. *Kidder*, 24 N. H. 364, 57 Am. Dec. 287.

In the case of *Cline* v. *Baker*, 118 N. C. 780, 24 S. E. 516, it was held that if a dam and pond in a stream were the direct cause of the injury, although such injury was aggravated by other causes over which he had no control, the defendant would still be liable. And the same is the holding of the court in *State* v. *Holman*, 104 N. C. 861, 10 S. E. 758.

This rule is especially applicable to the case at bar, inasmuch as the record tends to establish that the Spragg, Alcorn & Bewley dam caused the bed of the river to be filled with silt and debris which formed bars and islands, which in turn, as a natural consequence, affected the flow of the stream. The formation of these bars and islands is established not only by the testimony of many witnesses, but by the photographs admitted in evidence and found in the record of the case.

In his work on Waters and Water Rights, Mr. Farnham says:

"The riparian owner is not bound to keep the channel

of the stream free from debris which may find its way there naturally, and is not liable for injury to upper property owners by the fact that its accumulation in the stream sets the water back over the boundary line. But, in erecting artificial structures in or across the stream, he is bound to take notice of the liability of such material to be impeded by the obstruction and so become a menace to upper property, and he will be liable in case he builds his structure in such a way that it will necessarily cause drifting material to dam the water back, or in case he fails to remove the material after he sees that it is being piled up so as to form a dam." (Farnham on Waters and Water Rights, vol. 2, sec. 570.)

The assertion of the learned author in this respect is supported by eminent authority. I deem it especially applicable to the conditions presented by the record in this case, for, as I have already stated, the obstruction in the Walker River known as the Spragg, Alcorn & Bewley dam was in the first instance but a slight obstruction, thrown partially across the bed of the stream. As years passed, the ditch known as the Spragg, Alcorn & Bewley ditch, into which the dam was intended to divert the water, filled more or less with sediment and debris, and, as such condition progressed, the dam in question was raised and enlarged, and its effect was to impound such silt or sediment or debris as naturally passed down the channel, thus filling up the natural bed of the river. We find the doctrine asserted here supported by abundance of authority: *Blizzard* v. *Danville*, 175 Pa. 479, 34 Atl. 846; *Ames* v. *Dorset Marble Co.*, 64 Vt. 10, 23 Atl. 857; *Schuylkill Navigation Co.* v. *McDonough*, 33 Pa. 73; *Athens Mfg. Co.* v. *Rucker*, 80 Ga. 291, 4 S. E. 885; *Kroeger* v. *Twin Buttes*, 13 Ariz. 348, 114 Pac. 553, Ann. Cas. 1913E, 1229.

We are referred to the cases of: *Fleming* v. *Lockwood*, 36 Mont. 384, 92 Pac. 962, 14 L. R. A. n. s. 628, 122 Am. St. Rep. 375, 13 Ann. Cas. 263; *Proctor* v. *Jennings*, 6 Nev. 83, 3 Am. Rep. 240; *Lapham* v. *Curtis*, 5 Vt. 375, 26 Am. Dec. 310; *Hoffman* v. *Tuolumne County Water Co.*, *supra*.

While the rule laid down by the courts in these cases might be applicable to a different set of circumstances than those presented in the record, nevertheless it has been held in many cases that a direct injury may result and be actionable from the construction of a dam across a stream by which the stream is caused to be filled with sand and to overflow the premises of upper landowners. (*Avery* v. *Vermont Electric Co.*, 75 Vt. 235, 54 Atl. 179, 59 L. R. A. 817, and note, 98 Am. St. Rep. 818; *Winchell* v. *Clark*, 68 Mich. 64, 35 N. W. 907; *Morris* v. *Commander*, 25 N. C. 510; *Haas* v. *Choussard*, 17 Tex. 588; *Masonic Temple Assn.* v. *Banks*, 94 Va. 695, 27 S. E. 490; *Miller* v. *Stowman*, 26 Ind. 145; *Coloney et al.* v. *Farrow*, 91 Hun, 82, 36 N. Y. Supp. 164; *Junction City Lumber Co.* v. *Sharp*, 92 Ark. 538, 123 S. W. 370; *Moffet* v. *Brewer*, 1 G. Greene, 348; *Hill* v. *Ward*, 2 Gilman, 285; *Brown* v. *Bowen*, 30 N. Y. 519, 86 Am. Dec. 406; *Broadway Mfg. Co.* v. *Leavenworth T. R. B. Co.*, 81 Kan. 616, 106 Pac. 1034, 28 L. R. A. n. s. 156, and note.)

The prevailing opinion holds as error the action of the trial court in permitting witnesses to give their opinions as to what caused the river to fill with sand and as to what caused the overflow on the McLeod land; and appellants direct our attention to the testimony of respondent's witnesses, Harry R. Warren, William Rallens, Charles T. Martin, T. G. Nichol, G. H. Baker, J. C. Mills, Frank Feigenspan, James Nichol, Chas. McLeod, G. B. Waldo, and Angus McLeod. The first objection raised to this class of testimony is that none of these men had any particular scientific training or instruction on the subject of hydraulics or the effect of dams upon the current of streams or the deposit of sand and sediment in streams. It is asserted by appellants that while some of these witnesses were more or less conversant with this particular dam and the river and the McLeod ranch, and were in a position to observe what took place, others did not know the fall or grade of the water through which the river flowed, and were not present when the river overflowed and did not know where it overflowed, and were not familiar with

other obstructions between the point of overflow and the Sprigg, Alcorn & Bewley dam.

To the witness Harry Warren was propounded this question:

"Q. What is or was the cause of the river filling there with debris as you have described it above the Spragg, Alcorn & Bewley dam in the river to the point you have described?

"Mr. Treadwell—We object on the ground that it calls for the conclusion of the witness, and not for any fact; and it takes from the jury the determination from the facts of the ultimate question in the case. We object on the further ground that, in as far as it asks for the opinion of the witness, the witness has not qualified and is not shown to be an expert on any subject that would permit him to give his opinion to the jury.

"The Court—Gentlemen, before the noon recess I made a ruling on the matter of the admissibility of certain testimony here, which I have been considering, and which I now retract, owing to the fact that this witness, Mr. Warren, has shown himself, to the satisfaction of the court, by his testimony to be an expert. His knowledge and experience during the fourteen years that he has lived on or near the Walker River, and his familiarity with the river, dam, ditches and sloughs, concerning which his testimony has been given, has sufficiently qualified him to give evidence as to the filling of the river with sand. The rule of law is, where one is qualified to testify to certain facts, he may give his opinion as an expert. There are certain facts which the witness is supposed to have peculiar knowledge of, and for that reason the objection is overruled."

The witness William Rallens was interrogated, over the objection of appellants, as to cause of the sand and sediment in the river, and as to what caused the river to overflow its banks. The record is as follows:

"Q. Do you know how the water of the river came to overflow on those places along the ranch, as you describe it?   A. I do.

"Q. What was the cause of the overflow on the McLeod place? A. By building up the dam, causing sand and sediment in the river, and causing the river to overflow its banks.

"Q. What dam do you refer to? A. The Spragg-Bewley-Alcorn dam."

The witness Charles T. Martin was interrogated:

"Q. What was the cause of the damage to the land? A. Well, the cause was, the river bed was full of sand, and the water had to flow out some place?

"Q. Do you know the cause of the filling of the river with sand? A. Yes.

"Q. Now, what was the cause? A. Well, from my experience being on that river, I know that dams cause the sand to form in the river.

"Q. Now, as to this place, the particular place known as the McLeod place, what particular dam do you have reference to as having caused the deposit of sand? A. I have reference to the Spragg-Bewley-Alcorn dam."

The witness T. G. Nichol was interrogated, and testified:

"Q. Do you know what caused the deposit of sand in the channel of the river above the Spragg-Bewley-Alcorn dam? A. Yes.

"Q. What was the cause of the deposit of sand in the channel of the river above the dam, and up as far as the ford at the McLeod house? A. The dam, the Spragg-Bewley-Alcorn dam.

"Q. Do you know what caused the overflow? A. The river not having capacity to carry the water.

"Q. Why didn't it have the capacity? A. The river filling up with sand."

The witness G. H. Baker was interrogated, and testified as follows:

"Q. Do you know what effect the building of these brush dams has upon the bed of the river above the dams? A. I do.

"Q. What is that effect? A. Naturally fills the bed of the river with sand. A dam would not stay there if you

don't get sand piled up to hold it there when high water came.

"Q. Take a dam, say from six, seven, or seven and one-half feet in height, how far will the sand back up back of the dam, in the river bed, in course of time? A. A dam six or seven feet, down in the valley where there is not much fall, will probably back sand for two miles."

At another place, later on, the witness was interrogated, and testified:

"Q. Now, then, do you know what caused the damage to the McLeod ranch? A. Yes.

"Q. What was the cause? A. The carrying capacity of the river was so filled up with the debris and sand that the sand overflowed its banks.

"Q. Then, as a matter of fact, it was simply because the carrying capacity of the river was lessened by means of this filling you speak of? A. Yes.

"Q. What was it that lessened it, this carrying capacity? A. My judgment, this dam put in the river filled it up.

"Q. Which one do you have reference to? A. Spragg-Bewley-Alcorn dam."

The witness J. C. Mills was interrogated, and testified:

"Q. Now, then, do you know what caused the sand to fill in the river at or near the headgate of the Merritt ditch? A. Yes.

"Q. Now, then, what was the cause of the sand gathering in and filling in the river bed? A. It was the Spragg-Bewley-Alcorn dam.

"Q. Do you know the cause of this overflow of the McLeod ranch? A. Yes.

"Q. Now, then, what was the cause? A. The reason of the overflow was the channel of the river was plumb full of sand and sediment. There was no room for the water in the old channel, and it had to get away some place.

"Q. Do you know the cause of this filling of this sand in the river, as you described it? A. Yes.

"Q. What was the cause? A. The Spragg-Bewley-Alcorn dam."

The witness Frank Feigenspan was interrogated, and testified:

"Q. What was the cause of the river filling so with sand at that point near the head of the Merritt ditch above and below? A. The Spragg-Bewley-Alcorn dam."

The witness J. E. Gignoux was interrogated, and testified:

"Q. Do you know what caused the overflow on the ranch as you found it? A. Yes.

"Q. What was the cause? A. The dam.

"Q. Now, if you know, I wish you would explain to the jury what effect that dam had upon the river, and why it caused the overflow? A. The dam checked the flow of the water, causing a deposit of sand gradually to fill up the bed of the river and channel."

The witness Charles A. McLeod was interrogated, and testified:

"Q. Do you know what effect the building of that dam, as you have described it, has had upon the bed of the Walker River? A. I do.

"Q. What was that effect? A. Had the effect of filling the river with sand.

"Q. How far up the river, if you know, has this dam caused the river to fill with sand? A. Up in the neighborhood of the house.

"Q. Now, then, do you know the cause of the overflow and damage to the McLeod ranch, and crops growing on it? A. Yes.

"Q. What was the cause? A. The Spragg-Bewley-Alcorn dam."

The witness G. B. Waldo was interrogated, and testified:

"Q. Do you know what brought about this change in the condition of the river at that point, near the Spragg-Bewley-Alcorn ditch, as you saw it in 1905 or 1906? A. Yes, I know.

"Q. What was the cause? A. The cause was by putting the dam in.

"Q. Describe the effect of that dam on the bed of the river above the dam through the McLeod place. A. They put a dam in the river, and it may back up for a quarter of a mile; if you keep building the dam up, it will back for a quarter of a mile until the current stops running, and this works on the river for a quarter of a mile or more, and then it fills the channel of the river with sand and sediment.

"Q. Do you know what caused the overflow of the McLeod place? A. Yes.

"Q. What was the cause of the overflow of the McLeod place, as you found it when you were there? A. By this dam being put in and making the channel of the river smaller and shallower."

The respondent Angus McLeod, being interrogated as to the cause that brought about the flooding of his premises, said:

"Well, I had better not say, I might not know, but I do know that it was caused by this dam in the river, I am positive; I know what it was; every one of them know that the dam caused the river to fill up and overflow."

Whatever might be observed with reference to the individual witnesses whose testimony is assigned as error, there are certain facts disclosed by the record applicable to all. It is the contention of respondent that these witnesses were fully qualified as experts. It is sufficient to say, however, that each one, according to the record before us, appears to have been more or less familiar with the Walker River, its nature and ordinary action, familiar with the dam known as the Spragg, Alcorn & Bewley dam, and familiar with the land and premises of respondent overflowed or inundated by the waters of the Walker River. Moreover, it is disclosed by the record that each of these witnesses had more or less experience in the construction and use of dams in this particular locality, and in this particular stream, and had by reason of their experience in this respect acquired at least some knowledge of the nature of the stream and its habits, or what it ordinarily did in the way of depositing

sand, silt, or sediment above obstructions thrown across it or placed so as to affect its current. Moreover, each one of these witnesses, according to the record, had been present on and about the McLeod ranch and premises at the time of the floods complained of and had observed the action of the Spragg, Alcorn & Bewley dam on the Walker River during the flood seasons.

The matter elicited by the interrogatories and the answers given were in each instance with reference to the subject about which the witnesses had qualified themselves, by more or less observation and experience, to testify. The weight of the testimony and its significance were in each instance matters for the jury. The reception or entertainment of such testimony has by some authority been regarded as a matter largely within the discretion of the trial court. (*Spring Co.* v. *Edgar*, 99 U. S. 645, 25 L. Ed. 487.)

I am favorably inclined to the doctrine set forth in the case of *Hand* v. *Catawba Power Co.*, 90 S. C. 267, 73 S. E. 187, wherein the court, considering a matter analogous to the one at bar, said:

"The court allowed plaintiff's witnesses, who were not experts, but who had, for many years, known and observed plaintiff's water power, and were familiar with the creek and the surrounding country, and had observed the results of freshets in the creek and river, to express their opinion that defendant's dam caused plaintiff's injury. The defendant contends that the ruling was erroneous. The rule is well settled that, when the matter or thing to which the evidence relates cannot be reproduced or clearly described to the jury, the witness, though not an expert, may give his opinion, after stating the facts and circumstances upon which it is based."

This doctrine is also supported by decisions in the case of *Seibles* v. *Blackwell*, 1 McMul. (S. C.) 56; *Jones* v. *Fuller*, 19 S. C. 66, 45 Am. Rep. 761; *Chemical Co.* v. *Kirven*, 57 S. C. 445, 35 S. E. 745.

The discretion which may be exercised by the trial

court in determining the admissibility of such testimony warrants a court of review in refusing to disturb its determination, unless the record discloses manifest error on the part of the trial court and prejudice resulting therefrom.

Opinions of witnesses familiar with given premises, or, as in this case, with a given stream and the territory through which it flows, are, we think, at least as certain where such witnesses have had an opportunity to observe, and their testimony shows them to be qualified and discloses no bias, as are measurements taken on the ground either before or after the occurrence of a given incident, such as the sudden overflowing of premises during a flood season. Especially is this true where such incident and the phenomena attending it are impossible of reproduction. (*Hand* v. *Catawba Power Co.*, *supra; McLeod* v. *Lee*, 17 Nev. 122, 28 Pac. 124.) It has been held that witnesses who qualified as to having had the experience may properly testify as to the effect produced by a given cause with the nature and surroundings of which the witnesses are cognizant. (*Ryan* v. *Manhattan Big Four M. Co.*, 38 Nev. 92, 145 Pac. 907.) Learning or technical training are not always essential elements of qualification to warrant a court in receiving the testimony of a witness. There is no fixed or invariable rule established, by which a trial court shall determine the exact degree and amount of knowledge, experience, or skill an expert shall possess before permitting him to testify. (*Carscallen* v. *Cœur d' Alene & St. J. T. Co.*, 15 Idaho, 444, 98 Pac. 622, 16 Ann. Cas. 544.)

It has been well stated that facts testified to by witnesses are to a large extent conclusions. A witness sees a thing done or a certain act performed; he has seen the thing done and the act performed many times before; he has had opportunity and occasion for observation; his testimony as to what caused or brought about the thing performed or the act done, although, strictly speaking, it is a conclusion, is not inadmissible.

A man who lives in the vicinity of a mountain stream, and who has had experience in the way of constructing dams in that stream for the purpose of diverting water into ditches, and knows the nature of that stream as being one that carries great quantities of silt and debris during flood season, and has had occasion to observe that the result of his obstruction placed in the stream is to impound and hold large quantities of this silt and debris, is, we think, eminently qualified to testify with reference to this subject and the causes that bring about certain conditions.

The prevailing opinion lays stress on the fact that the testimony offered in support of appellants' contention was elicited from experts and engineers trained in hydraulics, and pays a flattering tribute to one of these as being now chairman of the Fourth-section board under the Interstate Commerce Commission, and then goes on to say:

"In opposition to the testimony of defendants' engineers and the testimony of Mr. Hammond (expert called in behalf of plaintiff), just quoted, is the testimony of several ranchers who had lived in the community for a number of years."

This is indeed a sublime comparison.

The witnesses in this case, whose testimony was objected to by appellants, were, according to their testimony, residents of Mason Valley, some of them for many years, and all of them for a length of time which in my judgment warranted the court in admitting their testimony to the jury. The facts testified to, so far as physical appearances and after results were concerned, were all afterwards viewed by the jury, and they had opportunity thereby to judge of the credibility and competence of these witnesses and to come to conclusions for themselves as to whether or not the witnesses were correct in their statements as to the cause of the inundation. Whether or not there were physical facts which made the testimony of these witnesses or the conclusion

reached by them inaccurate was a matter for the jury to determine; and they by their general verdict having determined the matter in favor of the plaintiff; respondent herein, their finding in this respect, having in my judgment substantial evidence to support it, should not be disturbed.

It is asserted by appellants that the witnesses offered by them at the trial were men of technical training and experts in the lines of hydraulics. This may be true, but appellant's argument in this respect is made to the wrong tribunal. It was a matter for them to impress on the jury, which they no doubt did present in a manner in keeping with the splendid ability of the eminent attorneys for appellants. It was for the jury to determine, after all, as to which of these witnesses they would believe. There is no rule, of which we are aware, that will compel a jury to disregard or disbelieve any competent, material, relevant evidence properly admitted. Verdicts may be arrived at on a single assertion made by the most humble, illiterate individual as against profound statements uttered by men of technical training.

Appellants complain that the witnesses whose testimony was objected to were permitted to testify positively as to the cause of the overflow of the Walker River on the premises of respondent. This, I think, is well answered in the assertion of Mr. Wharton in his work on Evidence, wherein the author asserts in substance that an opinion, so far as it consists of a statement of an effect produced on the mind, becomes primary evidence, and hence admissible whenever the condition of things is such that it cannot be reproduced to the jury. (*Hand* v. *Catawba Power Co.*, *supra*.)

In the case of *People* v. *Jennings*, 252 Ill. 534, 552, 96 N. E. 1077, at page 1083 (43 L. R. A. n. s. 1206, 1213), the court said:

"While it is usual for expert witnesses to testify that they believe or think, or in their best judgment, that such and such a thing is true, no rule of law prevents them from

testifying positively on such subjects.   It is for the jury to determine the weight to be given to their testimony." (Wharton on Criminal Evidence, 8th ed. sec. 459; 1 Wigmore on Evidence, secs. 656–659; Jones on Evidence, 2d ed. sec. 360; *Ryan* v. *Manhattan Big Four Mining Co.*, *supra.*)

Mr. Rogers, in his work on Expert Testimony (2d ed. p. 7), briefly asserts the rule as follows:

"The court must decide whether the subject-matter to which the testimony relates is of such a nature as to warrant the introduction of opinion evidence from nonprofessional witnesses.   In deciding that question the court will be governed by the following principles:  (a) It is competent for a witness to state his opinion in evidence when the primary facts on which it is founded are of such a nature that they cannot be adequately reproduced or described to the jury, so as to enable another than the actual observer to form an intelligent conclusion from them.   (b) And when the facts upon which the witness is to express his opinion are of such a nature that men in general are capable of comprehending and understanding them."

This learned author quotes generously from the case of *Porter* v. *Pequonnoc Mfg. Co.*, 17 Conn. 249, wherein the court, in dealing with the question of the admissibility of the opinion of nonexpert witnesses, where the question was as to the strength and sufficiency of a dam to sustain a quantity of water, said:

"They (the witnesses) had acquired, by their personal observation, a knowledge of the character of the stream, and also of the dam, and were therefore peculiarly qualified to determine whether the latter was sufficiently strong to withstand the former.   The opinions of such persons, on a question of this description, although possessing no peculiar skill on the subject, would ordinarily be more satisfactory to the minds of the triers, than those of scientific men, who were personally unacquainted with the facts in the case."

In the case of *County Commissioners* v. *Wise*, 71 Md. 43, 18 Atl. 31, the Court of Appeals of Maryland held, in

an action for damages caused by the washing away of a bridge alleged to have been unskilfully built:

"It is competent to allow a witness to testify, from his knowledge of the stream, extending back" over a number of years, "whether the width of the span and the height of the bridge were sufficient to enable the water to pass."

But no ruling on this subject is, in my judgment, any stronger than that found in the decision of this court in the case of *McLeod* v. *Lee,* 17 Nev. 103, 28 Pac. 124. That was a case almost identical to the one at bar. Respondent herein was also respondent therein. And the rule asserted in that case is that the observations, judgment, and opinions of witnesses acquainted with the premises as to the cause of the overflow were as certain and direct as the measurements that were taken upon the ground. The rule asserted by this court in *McLeod* v. *Lee, supra,* is cited by Mr. Rogers in his work on Expert Testimony in support of the assertion that the opinions of ordinary nonexpert witnesses may be received on the question of what was the possible cause of a given effect. (Rogers on Expert Testimony, 2d ed. p. 15.) The assertion of this court in the case of *McLeod* v. *Lee, supra,* is no less emphatic upon the point in question than is that of many other jurisdictions, to wit: *Clinton* v. *Howard,* 42 Conn. 294; *Indianapolis Street Ry. Co.* v. *Robinson,* 157 Ind. 414, 61 N. E. 936; *Barry* v. *Farmers' Mutual Ins. Assn.,* 110 Iowa, 433, 81 N. W. 690; *Laird* v. *Snyder,* 59 Mich. 404, 26 N. W. 654; *Ohio R. Co.* v. *Long,* 52 Ill. App. 570; *White* v. *Farmers' Mutual Fire Ins. Co.,* 97 Mo. App. 590, 71 S. W. 707; *Dwyer* v. *Buffalo General Electric Co.,* 20 App. Div. 124, 46 N. Y. Supp. 874; *Virginia-Carolina Chemical Co.* v. *Kirven,* 57 S. C. 445, 35 S. E. 745; *Texas & P. Ry. Co.* v. *Wooldridge* (Tex. Civ. App.) 63 S. W. 905; *Union Pacific R. Co.* v. *Gilland,* 4 Wyo. 395, 34 Pac. 953; *St. Louis & S. F. Ry. Co.* v. *Bradley,* 54 Fed. 630, 4 C. C. A. 528.

The prevailing opinion assumes to assert that there could be no liability in damages in this case, even assuming that the dam could cause the deposition of sand in

the bed of a river above the highest point of backwater, for the reason that dams in river channels are essential to irrigation in this state, and that the law recognizes irrigation not only as lawful, but as especially favored, and that damage caused otherwise than by direct overflow is such a consequential damage that no liability in the law exists therefor.

If this assertion had any foundation either in custom or law, it would be inapplicable here. The dam in question here was not essential to the ditch, in so far as the original purpose of that waterway was concerned. The dam was only essential to the forced, unusual, and, if I read the record aright, unreasonable use to which the Spragg, Alcorn & Bewley ditch was put. In this I have reference to the fact, as disclosed by the record, that three dams were thrown across the Spragg, Alcorn & Bewley ditch to force the water out of that ditch into branch ditches constructed to cover higher lands, and I have reference to the further fact, as disclosed by the record, that the ditch which was five feet deep at its construction was, by reason of the new use to which it was forced, filled up with sediment and sand and debris until it was little more than half of its original dimension. The Spragg, Alcorn & Bewley dam, according to the record, was constructed, not for the purpose of forcing water into the Spragg, Alcorn & Bewley ditch, for that was unnecessary, inasmuch as the ditch originally took water from the river without a dam, but the dam was constructed to overcome the effect of the filling up of the ditch, brought about by the obstructions thrown across it and the new, unnatural use which it was made to serve.

Mr. Farnham, in his work on Waters and Water Rights (vol. 2, sec. 551), says:

"An action will lie for penning backwater, as soon as it interferes with a use to which the upper proprietor attempts to put his land, although he was not making such use of the land when the dam was built. In order to give the upper owner a right of action the water must

be set back over his line, because neither the erection of
a dam nor the ponding of the water is a nuisance *per se.*
So, it is not the erection of the dam which gives the right
of action, but the subsequent use of it in case it throws·
the water across the line."

The prevailing opinion in this case, in my judgment, is
based upon a false conception of the testimony and the
record as it is presented to this court.    The Spragg,
Alcorn & Bewley ditch was originally constructed to lead
from the river into what became known as the Spragg,
Alcorn & Bewley slough, sometimes called the Mason
slough.    The latter was utilized as a ditch by the original
constructors.    Spragg, who originally constructed the
ditch, testified that at the time of the construction of his
ditch the banks of the river at the intake of the ditch
were approximately seven to seven and one-half feet.    He
testified that it required no dam to force the water from
the Walker River into the ditch.    He testified that so
great was the flow of water through the ditch thereafter
that it caused him to be apprhensive lest it should injure
parties who lived below.

The testimony of Harry Warren is to the effect that
three separate dams had been thrown across the Spragg,
Alcorn & Bewley ditch for the purpose of supplying water
to three separate branch ditches, each one of which took
the water at the height of its respective dam; the object
of this being to cover higher lands.    These dams main-
tained in the Spragg, Alcorn & Bewley ditch raised the
level of the water in that ditch and so forced it back as
to make it necessary to continuously raise the Spragg,
Alcorn & Bewley dam in the river.

The witness Harry Warren testified that in 1904 and
1905 the Spragg, Alcorn & Bewley dam had been so
raised and enlarged that the water flowing over the dam
had a drop of between six and seven feet.    The witness
was interrogated and testified:

"Q.    Can you describe the difference in the condition of
the river between the Spragg, Alcorn & Bewley dam and

the head of the Merritt ditch in 1904, and when you saw it in the years preceding—say fourteen years back? A. It was filled up an average of three feet, I think.

"Q. In 1904 was there any difference in the river above and just below the Spragg, Alcorn & Bewley ditch? A. It was higher above than it used to be in the earlier days, owing to the bottom being filled up.

"Q. What do you mean by higher; the sand in the river, or the water? A. The sand bar was higher above than below. The sand was three feet higher than below.

"Q. Then the water is level across that dam and had a drop of three feet just over the dam? A. Had a drop of between six and seven feet.

"Mr. Treadwell—In 1904? A. Yes, in 1903.

"Q. How was that in 1905? A. It was very near the same, only the drop of the dam washed off a little bit.

"Q. Now in 1904, at the time you bulkheaded the Merritt ditch, did you notice how much farther up the stream this filling of sand had gone? A. Clear up above the Merritt ditch, filled up so much made it fall from the river into the Merritt ditch. We would say among ourselves, the high water would come again.

"Q. To fall from where into the Merritt ditch? A. From the river, the bottom of the river.

"Q. Then the sand had filled in so much that the bed of the river was raised above the head of the Merritt ditch? A. Quite a fall. We could have taken the dam out at the Merritt ditch, and it would have taken the river at that time."

The Merritt dam, upon which stress is laid in the prevailing opinion as having been an agency in contributing to the flooding of the premises of respondent, was originally but eighteen inches high. It was covered over with the sand that extended upstream from the Spragg, Alcorn & Bewley dam as early as 1884. It was never used as a dam after that date. As early as 1885, it was covered three feet deep with the sand that extended from the Spragg, Alcorn & Bewley dam. The banks of the river in the vicinity of the Merritt dam, which were

originally approximately seven feet high, were in 1904 but three feet high. These facts are set forth in the record from the testimony of Feigenspan, Warren, McLeod, Waldo, and many others, and these facts are supported by the measurements taken by the respective engineers who testified in the case. May we not question how could the Merritt dam, covered over by a deposit of sand and sediment to a depth of three feet as early as 1885, have affected the flow of the stream in 1904? One other pertinent question appeals to us from the record, in view of the position taken in the prevailing opinion. Could the Merritt dam, that had passed out of existence as early as 1884, have caused the deposit of silt and sediment below or downstream from the place where it once existed? And if this must be answered in the negative, then another question appears to me to be pertinent: What caused the filling in of the bed of the stream to a depth of approximately three feet downstream from the Merritt dam that had gone out of existence, and between the place where it once existed and the Spragg, Alcorn & Bewley dam?

Let us apply the doctrine of physical impossibility, the keynote of the prevailing opinion, to that section of the bed of the river between the place where the Merritt dam once existed and the Spragg, Alcorn & Bewley dam, and let us take the assertions relied upon as facts in the prevailing opinion. The prevailing opinion assumes the distance between the Spragg, Alcorn & Bewley dam and the Merritt dam to be 4,000 feet. The prevailing opinion assumes the height of the Spragg, Alcorn & Bewley dam to be three and one-half feet. The prevailing opinion assumes the grade of the river between these two points to be one foot to every thousand linear feet. The conclusion reached from these assumed facts is that the Spragg, Alcorn & Bewley dam could not affect the flow of the stream to a point farther up than 3,500 feet. What caused the filling in of the channel of the stream for the other 500 feet? The rule relied upon in the prevailing opinion asserts that it was a physical impossibility.

for the Spragg, Alcorn & Bewley dam to accomplish this, and yet the record discloses that the entire distance between the two dams, or between where the Spragg, Alcorn & Bewley dam actually existed, and where the Merritt dam once existed, was filled in and the bed of the river raised approximately three feet for the entire distance. It was so filled in both above and below the place where the Merritt dam once existed that the Merritt dam itself was covered to a depth of three feet. Our effort in this respect, however, is lost, in view of the fact that the distances, dimensions, and grades asserted in the prevailing opinion are, as I view it, unsupported by the record.

The prevailing opinion lays some stress on the fact that the water which flooded the premises of respondent flowed back into the river some distance above the Spragg, Alcorn & Bewley dam. This is relied upon as a fact tending to disprove the effect of the Spragg, Alcorn & Bewley dam on the river at the point where the water broke from the river channel. It requires but a reading of the record in this case to account for this. The record discloses that measurements and elevations taken establish that in many places upstream from the Spragg, Alcorn & Bewley dam the banks of the river were not flooded by the overflow in the years complained of, while portions of the premises remote from the river were covered with water. This was due to the fact that the banks of the river were higher than great portions of the surrounding country. Moreover, it requires but a reading of the transcript in this case, and in fact a reading of the briefs of appellants, to ascertain the fact, as established by measurements and levels taken, that for some distance above the place where the Spragg, Alcorn & Bewley dam is situated the banks of the river, as well as portions of the surrounding territory, are higher than the flooded portions of respondent's premises, and higher than the greatest elevation reached by the flood waters.

The prevailing opinion makes the assertion that the Spragg, Alcorn & Bewley dam was, prior to 1903, never

more than four feet high, and at no subsequent time over five feet high. Unless we are to accept the testimony of one witness as against that of another, I am unable to see how this court can adopt this assertion. The bank of the river at the place where the Spragg, Alcorn & Bewley dam was located was, prior to the construction of the dam, according to nearly all the witnesses, at least seven feet high. The witness Nichol testified that between 1885 and 1896 the dam was from one and one-half feet to two feet below the banks of the river, from which it follows that the dam was at least five feet high. The witness Plummer testified that the dam was about two or two and one-half feet below the banks of the river in 1899, resulting in the conclusion that the dam was then four and one-half feet high. The witness Gifford, manager of the Miller & Lux properties and foreman and manager of the Miller & Lux interests in the Spragg, Alcorn & Bewley ditch and dam, testified that up to 1903 the dam was two and one-half feet below the banks of the river, resulting in the conclusion that the dam was at least four and one-half feet high at that time. The witness Spragg testified that in 1867, when he disposed of the Spragg, Alcorn & Bewley ditch, it was five feet deep at its intake; that the bottom of the ditch was above the bed of the river; and that at the intake of the ditch there was a deep hole in the bed of the river.

The witness Waldo testified, corroborating the statements of Spragg as to the original depth of the ditch, and further testified that at the intake the bed of the river was about four feet below the bottom of the ditch. This testimony would warrant the conclusion that at the time when these witnesses were interested in the Spragg, Alcorn & Bewley ditch, and before the construction of the dam, the distance from the bottom of the river to the top of the bank was approximately nine feet. Applying to this the testimony of Gifford, manager for the appellant companies, that in 1903 the dam was two and one-half feet below the banks of the river, it amounts to but a simple matter of deduction that from the bottom

of the river, as it was at the time of the first construction of the dam, to the top of the dam, as it was in 1903, was approximately six and one-half feet. This is further supported by the testimony of Warren, wherein he stated that the water in 1903 had a drop over the dam of between six and seven feet.

The prevailing opinion states:

"The upper point of overflow, which is alleged to have caused considerable damage, was over two miles up the river from the Spragg, Alcorn & Bewley dam. The fall in the river is about one foot to the thousand, which would make the bed of the river at the Spragg, Alcorn & Bewley dam about ten and one-half feet lower than the upper point of overflow."

The witness Charles McLeod testified that the first overflow in 1904 was in June of that year, and was about 300 or 400 feet above the Perazzo cut, indicating that it was between stations 38 and 39 on respondent's Exhibit 1. This point, at most, could have been but a trifle over 4,500 feet from the Spragg, Alcorn & Bewley dam. The witness McLeod testified that this was the most remote point of overflow from the Spragg, Alcorn & Bewley dam in 1904.

The testimony of the witness Charles McLeod further establishes the fact that at the same time there was a break in the river bank and an overflow at or about the mouth of the crosscut indicated on respondent's Exhibit 1, this point being less than 2,000 feet upstream from the Spragg, Alcorn & Bewley dam and between the Spragg, Alcorn & Bewley dam and the Merritt dam; and I may observe parenthetically at this point that the Merritt dam could have had no effect upon this latter overflow. This observation I make in view of the position taken in the prevailing opinion that the Merritt dam may have contributed to the injury of respondent. It is hardly necessary for me to emphasize the fact that the Merritt dam could have contributed no part toward overflow that occurred between the position that it had formerly occupied and the Spragg, Alcorn & Bewley dam; nor need I

emphasize the further fact that the theory of physical impossibility could not relieve the Spragg, Alcorn & Bewley dam of the responsibility for this overflow. This flood covered a great portion of the McLeod ranch and practically destroyed the crops for that year.

In view of the record presented to this court, I am unable to see how the prevailing opinion can support the several assertions of fact relied upon therein for the several conclusions reached.

Summed down to its last analysis, this case presents physical conditions undeniable:

*First*—The premises of Angus McLeod, the respondent, were flooded by the overflow waters of the Walker River. Minor floods had taken place in years past, but the floods of 1904, 1905, 1906, and 1907 were such that they destroyed great tracts of cultivated land and covered other portions with sand and sediment.

*Second*—The bed of the Walker River had been filled in with sand and sediment from the Spragg, Alcorn & Bewley dam upstream to and beyond the point where the river broke from its banks and destroyed the premises of respondent. So great was the amount of the filling that at the intake of other ditches several thousand feet upstream it became necessary to build dams across the mouth thereof, to prevent the entire river from flowing through. Other dams that had been in existence in the river were entirely covered up with the sand and sedimentary deposit extending from the Spragg, Alcorn & Bewley dam upstream. From the Spragg, Alcorn & Bewley dam, and extending to and beyond a point where the greatest volume of water broke from the river banks, islands and bars had formed in the channel. Downstream from the Spragg, Alcorn & Bewley dam there was no filling in of the bed of the stream, no islands or other bodies in the channel, at least until after 1905 when the top of the Spragg, Alcorn & Bewley dam was washed off.

*Third*—The Spragg, Alcorn & Bewley dam had been continually enlarged to meet the increased demand for water through the Spragg, Alcorn & Bewley ditch. Three

dams had been thrown across the Spragg, Alcorn & Bewley ditch to force water into the several branch ditches. The ditch itself had been allowed to fill with sediment. All of which required the raising and enlarging of the main dam (the Spragg, Alcorn & Bewley dam) in the river.

Scientific experts, after viewing the premises, the dam, the river, and its surroundings, long subsequent to the flood, say that it was a physical impossibility for the Spragg, Alcorn & Bewley dam to have caused the flooding of respondent's premises. Scientific experts, viewing the premises, say that by reason of a rule known to hydraulics it was impossible for the Spragg, Alcorn & Bewley dam to have affected the flow of the stream or caused the deposit of sediment to a greater distance than to a point where a horizontal line drawn across the crest of the obstruction would intersect the bed of the stream. Yet, in the face of this testimony, we have the physical facts, the physical presence of the filling up of the bed of the stream, of the formation of bars and islands extending all the way from the Spragg, Alcorn & Bewley dam many thousands of feet farther upstream than this theoretical point of intersection. The flooded area covering the premises of respondent extended upstream from the Spragg, Alcorn & Bewley dam, and there was no flooded area, so far as the record discloses, below this obstruction.

Many other witnesses, laymen who were on the ground and in the vicinity at the time of the flood and for many years previous to it, who had opportunity to see and observe the Walker River at the time of the floods complained of, opportunity to see and observe the premises of respondent at the time of the floods complained of, at the time at which these premises were inundated— these witnesses, basing their testimony on no theory, but upon what they actually observed, testified not only as to what they saw with reference to the action of the river and the condition of the Spragg, Alcorn & Bewley dam, but from their experiences and observations extending through years, and in some instances through an

entire lifetime, told of the cause which wrought the destruction of respondent's farm.    They gave their personal observations.    They related physical conditions actually observed by them.    They said it was the Spragg, Alcorn & Bewley dam.    The jury impaneled to try the case, after listening to these two conflicting lines of testimony, and after visiting the premises themselves, rendered a verdict which by its general terms found the flooding of the premises of respondent to be due to the filling in of the original bed of the stream, caused by the Spragg, Alcorn & Bewley dam.

The position taken by my learned associates in this case in the prevailing opinion, as well as in the concurring opinion of Mr. Chief Justice Norcross, is in the first instance and primarily based upon scientific theories. They lay aside proven physical facts and accept what they term to be a "law of hydraulics."    Things positive are laid aside for things conjectural.

I know of no language more expressive of my views of this case than that asserted by the Supreme Court of Pennsylvania in the case of *Brown* v. *Bush, supra,* wherein that court, supported in its position by many authorities which I have taken occasion to cite, says:

"We do not undervalue scientific measurements, but the history of all engineering in Pennsylvania has shown that, whenever science has disregarded and set aside the testimony of local experience and observation, it has blundered, and has had to do its work over again.    Its conclusions may be fortified by the nicest experiments and the minutest calculations, but there are the fallibility of instruments, the unsteadiness of the hand or eye that uses them, the carelessness of assistants, and other causes which affect the results.    And then Nature has her own secrets, which she has not revealed, even to science. Who can calculate for what the watermen call 'piling' of water; or for the effect of removing a given obstruction a few rods farther downstream, whereby the velocity of the current at a particular point is changed; or for atmospheric resistance to water?    The question of fact in this

case was a very close one. No doubt the leveling was well done, but if in spite of it the water would make other marks than it did when obstructed only by the stone row, it was a telltale that could not be contradicted."

In the face of the record presented in this case, I am unable to close my eyes to the facts presented by the physical conditions found to be in actual existence, and adopt a theory which says it is a physical impossibility for these proven physical conditions to exist. I am unable to accept a theory which, even if certain, would in this case be inapplicable, and reject established facts.

## On Rehearing

By the Court, Coleman, J.:

Since this case was formerly before us, Angus McLeod has died, and on motion Mason E. McLeod and Charles A. McLeod, executors of his last will and testament, have been substituted.

When this case was before us originally, we did not consider the assignment of error relied upon by appellants which goes to the alleged erroneous ruling of the court upon the motion for a change of venue, for the reason that as we were of the opinion that the judgment should be reversed for other reasons, we did not think it necessary to consider that assignment, in view of the probable change of conditions in the county of the trial subsequent to the date of the former trial in the district court, and especially since, under the law as it now stands, an appeal can be taken directly from an order denying such a motion. We see no reason to change our position on this question at this time, and merely allude to it now because of the earnestness with which the assignment was urged upon us upon the argument on rehearing.

Before entering upon a consideration of what we deem to be the serious question in this case, we desire to dispose of one point presented by the respondents in their petition for rehearing and in the argument on rehearing,

and that is that in the original decision reversing the judgment we ignored the long line of decisions of this court holding that the supreme court will not disturb the verdict of a jury when there is a substantial conflict in the evidence. As to the general proposition of law contended for by counsel for respondents, there can be no question. But it seems to us that where the findings of the lower court are based upon incompetent evidence, admitted over the objection of the adverse party, to which exceptions were taken, and which admissions of evidence are assigned as error and relied upon in the appellate court, where it is held that the evidence was erroneously admitted, the contention must fall. Such was the theory upon which the court proceeded in the original decision herein, and we think the views then entertained are sound. The point most strenuously urged upon the rehearing is that the court took the wrong view of the law upon the question as to the competency of the evidence given by witnesses which was termed nonexpert. It was said by counsel for respondents that the views of the court as expressed on this question are contrary to all authority upon the question, and that "the decision in this case is an unquestionable reversal of the rules applied in the former decision of this court in *McLeod* v. *Lee,* 17 Nev. 103." We are forced to take issue with the contention of counsel. We did not undertake to distinguish the McLeod-Lee case in our former opinion, for the reason that we thought a mere perusal of it would convince any one of its nonapplicability to the situation here presented. But in view of the contention of counsel, we will point out wherein it is of no force in reaching a conclusion in this case upon the question of the competency of the nonexpert testimony admitted in the case. What was said in the McLeod-Lee case that could have any possible bearing upon the question involved will be found on pages 122 and 123, from which we quote:

"The testimony as to the character of the measurements taken is thus given by the defendant Lee. In

reply to the question, 'What was the difference in the level of the water above and below the dam?' he said: 'By an actual level made there, about sixty feet below the dam to sixty or eighty feet above, was eight inches and a half. I took the level with a spirit level and square. I waded out in the water up to my knees, and put the stakes down until I shoved them down with a level above; found it was correct, and called the attention of four or five persons present.'

"This witness also testified that he sailed over the dam in a flat boat, with a pole eight or ten feet long, and did not upset. 'When I got under the willows * * * I put down the pole as far as I could, but could not find any bottom in the current of the stream.'

"The character of the measurements, taken, as they were, with a spirit level and square, in the river, amidst the eddying tide of the water and the drifting currents of the sand, could not, it seems to us, be any more certain or direct than the observations, judgments, and opinions of witnesses who were well acquainted with the premises."

"Upon examination of all the evidence we think the plaintiff's witnesses testified as positively, direct, and certain as to the cause of the overflow as the witnesses on the part of defendants.

"There being a conflict of evidence, we cannot disturb the decision upon this ground."

It does not appear from the opinion that any objection was made to the testimony of the witnesses who gave their opinions as to the cause of the overflow, consequently the same question was not presented to the court in that case which we are called upon to determine, and it will be seen from that portion of the opinion quoted that the court did not put its stamp of approval upon the opinion evidence given in that case. About all it held was that as between what it probably thought unsatisfactory evidence given on both sides of the case, it would not disturb the verdict of the jury.

Another feature of that case, which robs it of all

semblance of authority for our guidance in the case at bar, is that the facts in that case presented an entirely different situation from that presented for our consideration. So far as can be gathered from a reading of the opinion, the point of overflow which was the basis of the action in that case was not more than sixty to eighty feet above the dam, while in the case at bar the point of overflow which did the most damage was two miles above the dam. There was no dam between the dam which caused the overflow in that case and the point of overflow, there were no cuts and ditches to be taken into consideration, as in the case at bar. Furthermore, a man could have stood at the dam in question in that case, and so far as appears from the opinion, have seen with his naked eye the backwater therefrom going out of the banks of the river sixty or eighty feet above. Surely no one would say that the situation there presented was in the least similar to the situation in the case at bar. In that case any person could have seen with the naked eye the direct effect of the dam in causing backwater to overflow the land.

Another distinguishing feature, and the most serious one, is that in that case nothing was claimed as a consequence of the deposit of sand in the stream, while in this case the entire reliance of plaintiff is based upon the deposit of sand far above the point where a line drawn from the crest of the water as it goes over the dam intersects the bed of the stream.

In the light of these distinguishing features, how can it be said that the McLeod-Lee case is authority in the case at bar, or of the least assistance to us in solving the question under consideration?

We will now take up the other cases relied upon by counsel, and undertake to show wherein they are dissimilar from the case at bar; and in this connection it must be kept in mind at all times that there are certain facts and circumstances which make this case dissimilar from any of the cases mentioned, viz., the existence of the Merritt dam between the Spragg, Alcorn & Bewley

dam and the points of overflow complained of, the making by plaintiff of the several cuts between the dams in question and the point of overflow chiefly complained of, and the cutting of the Perazzo ditch.

Of the cases cited, the one which approaches more nearly the case at bar is that of *Hand* v. *Catawba*, 90 S. C. 267, 73 S. E. 187; but in that case there was no dam above the dam alleged to have been the cause of the damage complained of; there were no fresh cuts made by the plaintiff, as in the case at bar; there was no ditch corresponding to the Perazzo ditch in the case now under consideration.   While the fall of the river in that case is not given, it is apparent that it was very slight.

The case of *Allen* v. *Thornapple*, 144 Mich. 370, 108 N. W. 79, 115 Am. St. Rep. 453, cited by respondents, was one in which suit was brought to recover for damages caused by backwater from a dam.   So far as appears, there was no controversy as to the competency of expert or nonexpert testimony.   It does not aid in determining the question here.   The same may be said of *Turner* v. *Hart*, 71 Mich. 128, 38 N. W. 890, 15 Am. St. Rep. 243. The case of *Brown* v. *Bush*, 45 Pa. 61, is one in which the facts were so dissimilar from the one at bar as to rob it of all value in assisting us in the present case.   In that case the dam was only 100 feet below plaintiff's property. It was not a case in which the deposit of sand caused an overflow two miles above the dam, as in the case at bar, but was a case where one standing at the dam could plainly see with the naked eye the effect of the dam upon the water.

As to the case of *Treat* v. *Bates*, 27 Mich. 390, all that need be said is that it was not a case where it was contended that a deposit of sand was caused, as in this case, nor are the distances nor the fall of the river nor the height of the dam given.   In short, no data is given upon which a comparison can be made to the case at bar.

Respondents complain bitterly of the position taken by this court in the former opinion in its holding in

regard to the testimony given as to a statement alleged to have been made by N. H. A. Mason, as follows:

"If they keep building that dam up, some day it is going to ruin your place."

Counsel say:

"It is strange that the court found no evidence in the record to sustain the contention that Mr. N. H. A. Mason was the predecessor in interest of defendants, Miller & Lux and Pacific Livestock Company."

Again counsel are mistaken. We knew full well when then considering the case that the evidence shows that Mason was the predecessor in interest of appellants Miller & Lux and Pacific Livestock Company. That was an admitted fact. If counsel will only read our opinion, they will see that we did not question Mason's prior ownership. What we did say was that there was no evidence in the record that Mason owned the property "at the time it is alleged he made the statement." The very language attributed to Mason, especially the word "they," indicates that if he did use the language claimed, it was some time after he parted with the title to the property.

Counsel for respondents complain also of our holding in the former opinion as to the proper method of proving the damages alleged to have been sustained by the respondents. We want to say that on this question the authorities are divided, and it is possible that we would not have reversed the judgment because of the method of proving the damages alleged to have been sustained, but in finding it necessary to reverse the judgment for other reasons, we thought it best to lay down what we believe to be the safer rule. And while we do not intend to elaborate upon this question, we will quote from Jones on Evidence, sec. 388, pocket ed., as follows:

"The question of damages is often so intimately connected with that of the value of property that it becomes necessary to consider whether expert witnesses may ever give their opinions as to the damages which a party has suffered in a given case. On a principle

discussed in another section it is evident that, if the witness may give an opinion as to damages, the practice is an exception to general rules, since this is a question for the determination of the jury. Undoubtedly it is the general rule that witnesses cannot give their opinions as to the amount of damages suffered in a given case. But there is a class of cases in which there is a decided *conflict* of authority as to the admissibility of opinions as to the amount of damages in *condemnation proceedings.* The courts of many of the states, perhaps a majority, hold that in such cases witnesses cannot state the amount of damages sustained thereby, on the ground that the amount of damages is the very subject referred to the jury. These courts confine the witnesses to a statement of the value of the property *before* and *after* its condemnation." (See authorities cited.)

It is also urged that the former opinion was erroneous in holding that it was improper to permit the plaintiff to testify as to how much, on an average, he made on his entire ranch for five years before the alleged damages were sustained. Plaintiff's ranch contained 940 acres. Let us assume that 250 acres of the very poorest land owned by plaintiff was damaged, and that the remaining 690 acres was very fertile and produced enormous crops of great value, could it be said that the method sought to be adopted by plaintiff to prove his damage would be the correct one? We think not. This illustration may be overdrawn; in fact, we think that the land alleged to have been damaged was about the best owned by the plaintiff, but it serves to show why the contention of counsel is not sound. While under some circumstances it is possible that it might be proper to resort to the method alluded to for the purpose of proving the value of land, it was certainly not proper under the circumstances of this case.

The question in this case upon which all others turn is: Did the Spragg, Alcorn & Bewley dam cause a deposit of silt and debris in the bed of the Walker River so as to

produce the overflows complained of? In support of the
contention of respondents, counsel presented an elaborate
discourse on hydraulics, and diagrams prepared by an
engineer. We have read and considered these with a
great deal of interest. We think we can dispose of all
that is said by the statement that the matter produced
does not deal with situations similar to those at bar.
The circumstances are so entirely at variance from the
ones in the case under consideration that we receive no
assistance from them in determining this case. But, to
reiterate our former conclusion, no matter what view we
reach as to the point where backwater from a dam will
cause a deposit of sediment, there is one physical fact
which cannot be ignored or disputed, and that is, if we
concede all that is contended for by respondents as to
the effect of a dam in causing the deposits of sediment
and debris, there is no way of escaping the conclusion
that if the Spragg, Alcorn & Bewley dam was causing a
deposit above it, the very same process was going on
above the Merritt dam, which was 4,000 feet upstream
from the Spragg, Alcorn & Bewley dam. Of course, it
is contended by respondents that the Merritt dam was
washed out. True; but it was rebuilt immediately, and,
so far as appears, was ever thereafter maintained, though
it was so covered with sand that it was not seen after
1906. But when we bear in mind that the Merritt dam
was at least eighteen inches in height, that it was 4,000
feet higher up the stream than the Spragg, Alcorn &
Bewley dam, and that the river had a fall of about one
foot to the thousand, it will be seen that the Spragg,
Alcorn & Bewley dam had to be five and one-half feet in
height (a height never claimed for it) before the back-
water from it would reach the top of the Merritt dam.
This is a law of physics that no evidence can overcome.

This opinion is to be read in connection with what was
said in the original opinion.

It is ordered that the judgment and order appealed
from be reversed.

Sanders, J., concurring:

I concur in the order of Justice Coleman.

I am of the opinion that it was prejudicial error on the part of the trial court to classify a number of witnesses, introduced on the part of respondent, as *experts* when no apparent reason or necessity existed therefor, other than to make it possible for these witnesses to give their opinion and state as an ultimate fact that appellants' dam caused the overflow.    This was the primary and ultimate fact to be determined by the jury.    It was a close and doubtful question, and in such situation it is not difficult to perceive the influence of such opinions and conclusions upon the mind of a juror called upon to determine a doubtful question.    It is conceded that opinion evidence is justifiable in a proper case upon the broad ground of necessity, but, as I view the record, the subject-matter concerning which the witnesses in question were interrogated did not justify an expression of their opinion, judgment or conclusion upon the ground of necessity.    In other words, these witnesses detailed, described, and laid before the jury, in a clear and intelligent manner, the facts concerning which they were interrogated, so that it was possible for the jury to draw its own inference and form an intelligent judgment as to the cause of the injury complained of.    I am aware that the opinion of Judge Hawley, in the case of *McLeod* v. *Lee,* 17 Nev. 103, 28 Pac. 124, is cited by modern texts on evidence in support of the proposition that the opinion of an ordinary witness as to cause and effect is admissible (1 Elliott on Evidence, sec. 674), but I am of the opinion that this distinguished jurist did not commit himself nor the court to such a doctrine.    The court in that case was dealing with an argument advanced as to the weight of the evidence.    In the case at bar we are called upon to rule upon the admission of evidence over a proper objection.    The witnesses who were permitted to state their opinions and conclusions as to the cause of the overflow had no difficulty in reproducing or describing to the jury the facts of the subject-matter concerning which they were interrogated,

and I conclude that no such necessity existed as would warrant or justify the court in permitting these witnesses to express their opinions and conclusions as to an ultimate fact upon which the respondent rested his case.

I am further of the opinion that, in view of respondent's knowledge of the then existing conditions resulting from long-continued past conditions of the stream, the court erred in refusing to instruct the jury fairly and correctly on the law covering appellants' evidence adduced in support of their affirmative defense that respondent contributed to his own injury. (*Malmstrom* v. *People's Ditch Co.*, 32 Nev. 246, 107 Pac. 98, distinguishing *Shields* v. *Orr Ditch Co.*, 23 Nev. 354, 47 Pac. 194.)

I am also of the opinion that the damages are excessive.

McCarran, C. J. dissenting:

I dissent.

In my judgment, there was nothing presented in the reargument which in any wise attempted to meet the various phases of the case discussed in my former dissenting opinion (40 Nev. 487, 153 Pac. 574). There I dwelt at length on the question of the admissibility of the so-called nonexpert testimony.

I am now forced to the belief that the learned justice who wrote the prevailing opinion here failed to grasp the full force and significance of the language of this court in the case of *McLeod* v. *Lee*, 17 Nev. 103, 28 Pac. 124. Moreover, it is manifest that the long and eminent line of authority supporting my position in my dissenting opinion and supporting this court in its decision in *McLeod* v. *Lee, supra*, has been lost sight of.

How different from the prevailing opinion is the application of the rule laid down in *McLeod* v. *Lee*, where the same is cited without comment by Mr. Rogers in his work on the Law of Expert Testimony. (Rogers on Expert Testimony, 2d ed. p. 15.)

In my judgment the conclusion reached in the prevailing opinion here, as in the prevailing opinion on the former hearing, is not supported by the record as it is before us.

In the prevailing opinion much stress is laid on the effect of the so-called Merritt dam, an obstruction in the stream some distance above the Spragg, Alcorn & Bewley dam. This obstruction, according to the record, was in the beginning about eighteen inches high. As early as 1884 the bed of the stream had become so filled with sand and sediment from the Spragg, Alcorn & Bewley dam that the Merritt dam was entirely obscured. The record negatives any idea of the Merritt dam having ever been used as a dam after the year 1884. The record discloses that in 1885 it was covered three feet deep with sand. So extensive was this deposit above the Spragg, Alcorn & Bewley dam that the banks of the river in the vicinity of the Merritt dam, which were originally approximately seven feet high above the floor of the river, were by the year 1904 not to exceed three feet high above the newly established bed of the stream. It requires but a reading of the testimony of Feigenspan, Waldo, McLeod, and Warren to determine these facts. Never after 1885, if the record is to be relied upon, could the Merritt dam have become an obstruction to any extent whatever. Never after that date could it have had any effect on the flow of the stream or in the way of obstructing sand or sediment or debris. I am at a loss to know how a foreign body buried three feet below the bed of the stream could affect the flow of water in that stream. The floor of the stream, as it originally existed, had been entirely covered by silt and sand to a depth of four feet, which covering, according to the record, extended from the Spragg, Alcorn & Bewley dam upstream far above and beyond the Merritt dam as it originally existed.

Whatever may be said as to the acts of respondent in making those certain cuts by reason of which it is contended he contributed to his own injury, some physical facts stand out unanswered. The Spragg, Alcorn & Bewley dam marked the lower terminus, so to speak, of the sand deposit. This deposit had grown from year to year as the Spragg, Alcorn & Bewley dam was extended in height. The Spragg, Alcorn & Bewley dam was raised

from year to year as new and higher lands under the Spragg, Alcorn & Bewley ditch were forced into cultivation. The record establishes that there was no deposit of sand below the Spragg, Alcorn & Bewley dam. The record establishes that the deposit of sand and silt in the bed of the stream above the Spragg, Alcorn & Bewley dam had commenced long prior to the construction of the cuts made by the respondent. I am at a loss to know how these cuts could have contributed to the injury of respondent, which injury was caused by the filling up of the bed of the stream, when a part of that filling up had taken place long prior to the creation of the cuts themselves. It was not the Spragg, Alcorn & Bewley dam alone which created the overflow of the lands of respondent. The record establishes that that overflow was caused by the filling up of the bed of the stream by deposits of sand and silt, which deposits were caused by the Spragg, Alcorn & Bewley dam. The record establishes that many of these deposits, and indeed much of the filling of the bed of the stream, were in existence long prior to the time at which it appears the respondent created the cuts by reason of which it is contended he contributed to his own injury.

Assuming for the sake of argument that all that is contended for with reference to the Merritt dam were true, and that it was a contributing cause, the prevailing opinion, in so far as it deals with this phase of the case, is antagonistic to a principle of law so well established as to be considered ruling. Mr. Farnham in his work on Water and Water Rights, vol. 2, p. 1892, puts the proposition thus:

"The owner of the obstruction cannot, however, escape all liability on the ground that other obstructions contributed to the injury, if his own did so, and if his own act was an efficient cause of the injury."

And the learned author cites the leading case of *Chapman* v. *Thames Mfg. Co.*, 13 Conn. 269, 33 Am. Dec. 401, in support of the proposition that:

"One who maintains booms in a river whereby the

water is set back upon the land of an upper riparian owner is liable for the resulting injury, although logs other than his own are stopped by the booms, and form the jams which raise the water, or even where the rise is caused by flood trash."

The concurring opinion of Mr. Justice SANDERS presents three statements novel and revolutionary. To my mind it is a lack of familiarity with the record which causes the learned justice to say that the trial court classified witnesses as experts—"for no apparent reason other than to make it possible for such witnesses to state their opinion and conclusion as an ultimate fact that appellant's dam was the sole cause of the injury."

The learned justice apparently overlooked the fact that at the instance and request of the defendant the court gave the following instruction:

"You are instructed that any witness, whether for plaintiff or defendant, who testified as to his opinion as to what caused the overflow of plaintiff's land, whether he formed that opinion upon investigation made before or after the overflow, or in any other manner, and whether engineer or not, comes within the definition of an expert referred to in these instructions, and his testimony as to such opinion was only admissible because such person was deemed by the court to have expert knowledge on that subject. Such expert testimony is to be construed by you in view of the ascertained facts and the known laws of nature, and you are not bound by the opinion of any witness of plaintiff or defendant if such opinion is contrary to the facts proved or to the known laws of nature."

Here was a specific request coming from the defendant in the way of an instruction allowed by the court, in which, at the instance of the defendant, any witness, "whether for plaintiff or defendant, who testified as to his opinion as to what caused the overflow of plaintiff's land, whether he formed that opinion upon investigation made before or after the overflow, or in any other manner," was to be considered by the jury as an expert.

I dwelt upon this phase of the case at length in my

former dissenting opinion.   The nonexpert witnesses who testified were in most instances, if not in every instance, citizens of the community who, living in the vicinity, experienced in the conditions there prevailing, actually observed the Walker River and the McLeod ranch during the period in which the latter was damaged by the overflowing of the former.  It was not an approximation based on subsequent conditions to which those witnesses testified.   It was the physical thing which they, present upon the premises, saw, each detail of which they related. If the assertion contained in the first proposition of the concurring opinion were to become the law, it would revolutionize a phase of the law of evidence which has received the sanction of authority such as is recognized wherever our system of jurisprudence prevails.   (3 Wigmore on Evidence, sec. 823; *Bonato* v. *Peabody Coal Co.*, 248 Ill. 422, 94 N. E. 69.)   As to whether the testimony of these witnesses was to go before the jury as the testimony of experts was a question largely in the discretion of the trial court, and the concurring opinion, like the prevailing opinion, fails to designate a single element or instance in which the trial court could be charged with abuse of discretion in this respect.

Any amount of authority might be cited to support the rule under which testimony such as that adduced from these witnesses was admissible, but the rule is so succinctly stated by Mr. Chief Justice Carter, speaking for the Supreme Court of the State of Illinois, in the case of *People* v. *Jennings*, 252 Ill. 534, 96 N. E. 1077, 37 L. R. A. n.s. 778, that I deem it sufficient to quote the same at length.   The learned justice says:

"Opinion, so far as it consists of a statement of an effect produced on the mind, becomes primary evidence, and hence admissible whenever a condition of things is such that it cannot be reproduced and made palpable in the concrete to the jury.   (1 Wharton on Criminal Evidence, 8th ed. sec. 459.)   It has been said that a witness must not be examined in chief as to his belief or persuasion, but only as to his knowledge of the fact.   'As far

as regards mere belief or persuasion which does not rest upon a sufficient and legal foundation, this position is correct, as where a man believes a fact to be true merely because he has heard it said to be so; but with respect to persuasion or belief as founded on facts within the actual knowledge of the witness the position is not true.'"

Mr. Lawson, in his work on Expert and Opinion Evidence, page 460, says:

"The opinions of ordinary witnesses derived from observation are admissible in evidence when, from the nature of the subject under investigation, no better evidence can be obtained, or the facts cannot otherwise be presented to the tribunal, *e. g.*, questions relating to time, quantity, number, dimensions, height, speed, distance, or the like.

"The indications themselves ought to be proved; and it is quite true that the jury are authorized to draw their own deductions from them; but no witness can fully present the appearances as they were before his eyes; and to take the testimony of what he saw without his opinion would seldom prove fully satisfactory, and would often be misleading.   *   *   *

"The general rule certainly is that witnesses are to testify to facts, and not to give their individual opinions. This rule, however, has its exceptions, some of which are as familiar and as well settled as the rule itself.   When all the pertinent facts can be sufficiently detailed and described, and when the triers are supposed to be able to form correct conclusions without the aid of opinion or judgment from others, no exception to the rule is allowed. But cases occur where the affirmative of these propositions cannot be assumed.   The facts are sometimes incapable of being presented with their proper force and significance to any but the observer himself, and it often happens that the triers are not qualified, from experience in the ordinary affairs of life, duly to appreciate all the material facts when proved.   Under these circumstances, the opinions of witnesses must, of necessity, be received."

As to the second proposition dealt with in the concurring opinion of Mr. Justice SANDERS, namely, the instruction given by the court dealing with the question of primary or proximate cause, I deem it a useless expenditure of time and space to cite authorities supporting the instruction as given. Suffice it to say that it has been sanctioned by this court. (*Konig* v. *N. C. O. Ry.*, 36 Nev. 181.)

The court gave ample instruction as to the issue of respondent's acts contributing to the injury. Instruction No. 19, given in behalf of the defendants was a clear and explicit statement directing the jury that—

"If there is no evidence sufficient to show to your satisfaction whether the injury was occasioned by reason of the defendant's dam or some other cause, then you cannot speculate or guess at the matter, but in the absence of any proof satisfying you as to the actual cause of the injury you cannot render a verdict for plaintiff in this case, but must decide for defendants."

Again, defendants' Instruction No. 23, given by the court, was one which clearly instructed the jury as to contributing causes.

Again, Instruction No. 33 dwelt specifically upon the acts of respondent in making the cuts alleged by the appellant to have contributed to the injury. The jury was there instructed that if they found that the acts of respondent in this respect contribute to his injury, they should find a verdict in favor of defendant.

In instructing juries as to the law applicable to a given case it is not, in my judgment, the duty of the court to give every instruction offered by the respective parties. If one instruction clearly and specifically covers the particular phase of the law applicable to some issue in the case, it is sufficient. Experience has taught that it is not as a rule the lack of instruction which tends to lead a jury astray, but rather the giving of promiscuous, disconnected, contradictory instruction, the volume and extent of which usually amount to a labyrinth in which the jury may become lost.

As to the third proposition relied upon in the concurring opinion, assuming for the sake of argument that the damages were excessive, such would be no ground for peremptory reversal by this court, inasmuch as it is within the province of this court, under its jurisdictional authority, to modify such damages. (*Konig* v. *N. C. O. Ry.*, *supra.*)

Let us assume that every element relied upon in the opinion of my learned associates was well taken. Let me ask: What was the *efficient cause* of the flooding of the lands of respondent?

The history of the Spragg, Alcorn & Bewley dam, as it is related in the record, answers this question. This obstruction in the Walker River had originally served the purpose intended by the original owners of the Spragg, Alcorn & Bewley ditch, namely, to divert the water for the Spragg, Alcorn & Bewley ditch as originally constructed. But the Spragg, Alcorn & Bewley ditch was put into forced service, so to speak, in later years, and lands which were not originally under the ditch were brought under by raising the level of the water in the ditch and throwing a series of dams across the same. To do this, the Spragg, Alcorn & Bewley dam was raised each season and hence made to perform a service unusual, unanticipated, and the effect of which could not be foreseen. In this forced and unusual service, in this new and changing condition of the dam, was the efficient cause of the flooding. The act of forcing the obstruction to perform this unusual and changing service was the efficient cause of the flooding, hence the efficient cause of the injury of respondent, the liability for which, in the language of Mr. Farnham, *supra*, the appellant should not escape. This condition, evidence supporting it, and everything pertaining to it, was brought to the attention of the jury and the whole matter presented under most elaborate instructions as to every phase of the law pertaining to the case. Under a long line of decisions by this court, the verdict of that jury, based as it was upon

a conflict of evidence, should not be disturbed by this court.

I refer again most emphatically to the matters dwelt upon in my former dissenting opinion, the assertions here made being only supplemental thereto.